# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

ADRIAN ALEXANDER ZARATE,

     Defendant.

No. 18-CR-2073-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## TABLE OF CONTENTS

Page

I.    *INTRODUCTION*…………………………………………………………… 4

II.   *FINDINGS OF FACT*……………………………………………………… 4

III.  *ANALYSIS* …………………………………………………………………… 9

    A.    *The Parties' Arguments* …………………………………………… 9

    B.    *The Warrantless Entry of the Hotel Room and Seizure of Defendant*……………………………………………………………11

          1.    *The Search* ……………………………………………………12

          2.    *The Seizure* ……………………………………………………13

                a.    *Public Place*……………………………………………15

                b.    *Probable Cause*………………………………………16

                c.    *Exceptions to the Warrant Requirement*………………16

       *i.*     **Exigent Circumstances** ……………………………17

           **A.**  **Officer Safety** ………………………………18

           **B.**  **Destruction of Evidence** …………………21

           **C.**  **Protective Sweep** …………………………22

       *ii.*    **Conclusion** …………………………………24

    *d.*    **The Seizure of Defendant was Unconstitutional** …………24

**C.**   **Suppression of Evidence** ……………………………………25

   *1.*    **Defendant's Statements** …………………………………26

    *a.*    **Defendant did not Waive his Miranda rights** ……………26

    *b.*    **Statements Made in the Hallway** …………………………31

    *c.*    **Statements Made at the Waterloo Police Station** …………35

   *2.*    **Ms. Patterson's Statements** ……………………………41

   *3.*    **The Search of Defendant's Person** ………………………46

**D.**   **The Search Warrants for the Hotel Room and Defendant's Urine** ……46

   *1.*    **Warrant for Hotel Room** ……………………………………47

   *2.*    **Warrant for Defendant's Urine** …………………………54

   *3.*    **Leon Good Faith Exception** ………………………………58

   *4.*    **Conclusion on Warrants as Written** ………………………60

   *5.*    **Independent Source Doctrine** ……………………………61

    *a.*    **Warrant for Hotel Room** …………………………………62

**b.** *Warrant for Defendant's Urine* …………………………65

*IV.* *CONCLUSION* ………………………………………………… 67

Case 6:18-cr-02073-CJW-MAR    Document 76    Filed 07/03/19    Page 3 of 68

# I.    INTRODUCTION

The matter now before me is Defendant's Motion to Suppress Evidence. (Doc. 47.) On December 19, 2018, the Grand Jury charged Defendant with Possession of a Firearm by a Drug User, in violation of 18 U.S.C. Sections 922(g)(3) and 924(a)(2), and Possession of a National Firearms Act Device Not Registered to Possessor, in violation of 26 U.S.C. Sections 5841, 5861(d), and 5871. (Doc. 3.) The charges arose from statements Defendant made during custodial interviews on October 11, 2018 and searches of a hotel room, vehicle, and urine specimen conducted on October 11, 2018 pursuant to search warrants issued by the Honorable David F. Staudt, Iowa District Court Judge.

The Honorable Charles J. Williams, United States District Court Judge, referred this motion to me for a Report and Recommendation. On March 22, 2019, I held an evidentiary hearing on Defendant's motion. The Government called as witnesses Waterloo, Iowa Police Officer Jordan Ehlers and Waterloo, Iowa Police Sergeant Robert Duncan. Defendant called Waterloo, Iowa Police Department Investigator Diana Del Valle.

For the following reasons, I respectfully recommend that the Court **GRANT in part and DENY in part Defendant's Motion to Suppress.**

## II.    FINDINGS OF FACT

On October 10, 2018, Waterloo Police Department Investigator Diana Del Valle received a tip from a confidential informant ("CI") that Defendant possessed a sawed-off shotgun; various bladed weapons; and methamphetamine, likely a personal-use amount. (Gov. Ex. 1 at 1; Diana Del Valle Hr'g Test.[1]; Jordan Ehlers Hr'g Test.) The CI also informed Investigator Del Valle that Defendant and a woman were staying at the Isle of Capri Casino Hotel in Waterloo, Iowa. (Gov. Ex. 1 at 1, 4.) Investigator Del Valle

---

[1] All citations to hearing testimony are to the March 22, 2019 evidentiary hearing.

4

personally observed Defendant in the passenger seat of a maroon Hyundai Santa Fe on October 10, 2018, at around 5:00 p.m. (*Id.* at 1.)  After losing sight of the vehicle, Investigator Del Valle telephoned Officer Jordan Ehlers later that evening to inform him of the tip.  Officer Ehlers then informed the other officers working the same shift. (*Id.* at 1; Del Valle Hr'g Test.)  Investigator Del Valle reported that the CI said Defendant was "heavily under the influence of methamphetamine and acting crazy."  (Ehlers Hr'g Test.)

Sergeant Robert Duncan located a maroon Hyundai Santa Fe with license plates matching those of the vehicle registered to Sierra Patterson in the parking lot of the Isle of Capri Casino Hotel around 12:47 a.m. on October 11, 2018. (Gov. Ex. 1 at 1, 4.) Sergeant Duncan peered through both the driver's side and passenger's side windows and saw what he believed to be the barrel of a sawed-off shotgun between the driver's seat and driver's door. (*Id.* at 4; Del Valle Hr'g Test.)  Sergeant Duncan testified that based on his training and experience, the gun barrel appeared too short to be legal under both Iowa and federal law.  (Robert Duncan Hr'g Test.)  Sergeant Duncan notified Officer Ehlers of the location of the vehicle and that there appeared to be a weapon inside. (Gov. Ex. 1 at 4.)

When Officer Ehlers and Sergeant Steven Bose arrived at the vehicle, Officer Ehlers also looked into the vehicle and noticed what he believed to be a sawed-off shotgun on the floor between the driver's seat and front driver's side door. (*Id.* at 1; Ehlers Hr'g Test.)  Officer Ehlers could tell by looking at the shotgun that it was illegal under state and federal law.  (Ehlers Hr'g Test.)

After other officers arrived to secure the vehicle, Officer Ehlers, Sergeant Duncan, and Sergeant Bose entered the casino hotel, spoke with staff, and learned that Defendant was staying in room 808. (Gov. Ex. 1 at 1, 4.) Officer Ehlers called room 808, pretending to be a hotel employee, and discovered Defendant and a woman were in the room. (Ehlers

Hr'g Test.) The officers directed a hotel staff member to knock on the door to room 808 while the officers stood out of view of the door's peephole to maintain their ruse. (*Id.*) The hotel staff made three successive attempts to induce Defendant to open the door, knocking while announcing, "Hotel front desk." (Gov. Ex. 8 at :40-2:18.) As they were waiting for someone to answer, Officer Ehlers could hear people moving around inside the room, but heard no noises that made him believe that evidence was being destroyed. (Ehlers. Hr'g Test.) After the third attempt, Defendant opened the door. (Gov. Ex. 8 at 2:32.)

Sergeant Duncan entered the room with his handgun drawn and told Defendant and the female occupant, Sierra Patterson, to put their hands up.[2] (Gov. Ex. 11 at 2:28-2:32; Gov. Ex. 1 at 4.) As Defendant stood in the room near the doorway with his hands raised, Officer Ehlers grabbed Defendant's right arm and pulled Defendant out of the room and onto the floor of the hallway. (Gov. Ex. 8 at 2:33-2:40; Gov. Ex. 11 at 2:30.) Officer Ehlers handcuffed Defendant, told him he was being detained, and patted him down for weapons, but found no weapon or contraband. (Gov. Ex. 8 at 2:40-3:32; Gov. Ex. 1 at 1.) From memory, Officer Ehlers recited Defendant his *Miranda* rights as follows:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to talk to an attorney and have one present with you when you're being questioned. If you cannot

---

[2] The only evidence of what happened at the hotel and in subsequent interrogations is the officers' testimony and body camera footage. The exhibits containing this footage do not have time stamps, so I do not know how much time elapsed from when Officer Ehlers saw the gun in Defendant's car to when officers entered room 808. However, given that Officer Ehlers learned about the gun in Ms. Patterson's car about 12:43 a.m. (Gov. Ex. 1 at 1), that he walked from the parking lot into the hotel after securing the car, that hotel staff members were cooperative, that officers were in room 808 for 18 minutes and 27 seconds (Gov. Ex. 11), and that Officer Ehlers asked Officer Lucas Scarborough to interview Defendant at the Waterloo Police Station at approximately 1:34 a.m. (Gov. Ex. 1 at 6), it is reasonable to assume that officers entered room 808 at around 1:00 a.m.

afford to hire an attorney, one will be appointed to represent you, if you wish. Do you understand these rights I have read to you?

(Gov. Ex. 8 at 3:44-3:55.) Defendant made no audible response and Defendant's face is not visible on the body camera video. (*Id.* at 3:56.) Officer Ehlers wrote in his police report that Defendant "stated he understood." (Gov. Ex. 1 at 1.) Officer Ehlers testified, however, that Defendant had "nodded his head." (Ehlers Hr'g Test.) On the video, after reciting the *Miranda* warning, there is a pause before Officer Ehlers began questioning Defendant. Officer Ehlers then told Defendant that they knew "illegal activities were going on." (Gov. Ex. 8 at 4:54.) Officer Ehlers asked if officers could search the hotel room. Defendant denied permission for the search. (*Id.* at 6:19; Gov. Ex. 1 at 1.) When Officer Ehlers mentioned obtaining a search warrant, Defendant admitted that a .380 handgun he had purchased was in the hotel room. (Gov. Ex. 8 at 7:06; Gov. Ex. 1 at 1.) At that point, Officer Ehlers arranged to have Defendant transported to the police station and performed another pat search of Defendant. During this search, Officer Ehlers found a glass pipe in Defendant's pants pocket. (Gov. Ex. 1 at 1; Ehlers Hr'g Test.)

Meanwhile, Sergeant Duncan spoke with Ms. Patterson inside the hotel room after placing her in handcuffs and *Mirandizing* her. (Gov. Ex. 1 at 4; Gov. Ex. 11.) In response to his questions, Ms. Patterson informed officers there was a ".38" handgun and marijuana in the room, as well as a .410 shotgun in her vehicle. (Gov. Ex. 1 at 4.) Officer Ehlers asked Ms. Patterson about Defendant's drug use. He said he was asking because Defendant "had a meth pipe on him and he seems like he's a little shook up." (Gov. Ex. 8 at 15:15, 16:34.) During the time Sergeant Duncan was speaking to Ms. Patterson, Sergeant Bose was also in the hotel room shining his flashlight around the room.

At the police station, Defendant was questioned further by Officer Lucas Scarbrough. (Gov. Ex. 1 at 6.) Prior to the questioning, Officer Ehlers told Officer Scarbrough that Defendant had been *Mirandized*. (*Id.*) Defendant stated he recently bought the .380 handgun from a friend for $150 and received the .410 shotgun and ammunition from a friend for free. (*Id.*; Gov. Ex. 10 at 1:44, 4:24.) Defendant also disclosed that he smokes marijuana and that there was marijuana in the hotel room. (Gov. Ex. 1 at 6.) Sometime during the interview, Defendant asked for an attorney and Officer Scarbrough ended the interview. (*Id.*)

At the police station, Officer Ehlers applied for three separate search warrants. (*Id.* at 2.) The first was for the Hyundai Santa Fe (Gov. Ex. 2), the second for room 808 at the Isle of Capri Casino Hotel (Gov. Ex. 3), and the third for a sample of Defendant's urine (Gov. Ex. 4). Officer Ehlers spoke with Investigator Del Valle on the telephone while completing the applications to gather the required information on the CI. (Ehlers Hr'g Test.) The warrant applications were accompanied by an "Informant's Attachment" and an "Addendum." (Gov. Ex. 2 at 4, 6.) On the Informant's Attachment, Officer Ehlers indicated the "above officer," presumably Investigator Del Valle, had known the informant for one month and the informant has supplied information more than five times in the past, which led to one arrest. (*Id.* at 4.) Additionally, the informant had otherwise demonstrated truthfulness and the information supplied by the informant in this investigation had been corroborated. (*Id.*) The Addendum provided the information given by the CI, investigator Del Valle's observations, the actions of the officers at the hotel, and statements made by Defendant and Ms. Patterson. (*Id.* at 6.) The warrants were signed by Judge Staudt. (Gov. Exs. 2, 3, 4; Ehlers Hr'g Test.)

Once the three search warrants were secured, officers executed them and seized an Ithaca .410 shotgun; ammunition; an axe; a machete; a Jimenez Arms .380 handgun; drug paraphernalia, including glass pipes and a digital scale; and suspected

methamphetamine and suspected marijuana. (Gov. Ex. 2 at 8; Gov. Ex. 3 at 7.) Defendant's urine tested positive for amphetamines and marijuana. (Gov. Ex. 7.) The length of the .410 shotgun barrel was 16.125 inches. (Ehlers Hr'g Test.) Defendant has never been issued a permit to carry weapons. (Gov. Ex. 1 at 2.) Additional facts will be discussed in the following analysis when relevant.

## III. ANALYSIS

### A.    The Parties' Arguments

Defendant alleges multiple and, to some extent, alternative bases to exclude the statements and physical evidence that were produced by the events described above. Defendant first complains of law enforcement conduct immediately after he opened the door and was removed from his room to the hallway floor and handcuffed.[3]  Defendant asserts this was a seizure that required a warrant and that no exceptions to the warrant requirement apply.  Defendant further asserts that fruits of the initial seizure and search of his person must be suppressed.  The fruits, he argues, include his statements, the statements of Ms. Patterson, and the products of the next two warrants (i.e., the items found in the hotel room and his urine). (Doc. 47-1 at 5.)

Defendant argues in the alternative that there exists an independent basis to exclude each of the challenged items of evidence. Defendant contends that Officer Ehlers's recitation of the *Miranda* warning was inadequate.  Therefore, his statements at the hotel and the police station must be suppressed along with the fruits of those statements (i.e., the search warrant for his urine).  Moreover, Defendant contends that Ms. Patterson's statements are inadmissible against him because they were a product of a violation of his own Fourth Amendment protection to be free of a warrantless search of the hotel room.

---

[3] I do not characterized these actions as a "search" or "seizure" at this point because that characterization is part of my analysis below.

Defendant also argues that the search warrants for the hotel room and for the urine sample were not supported by legally gathered evidence that amounted to probable cause and, therefore, all fruits from those searches must be suppressed. Defendant refers to the first entry into the hotel room by law enforcement without permission as a "search." (Doc. 62 at 5.) Defendant then asserts that law enforcement used information illegally obtained from this initial search and the seizure of the occupants as part of the applications for the subsequent search warrants. He requests those portions of the applications be excised because they contain fruits of the illegal search and seizure of the room and its occupants. Without the excised poisonous fruit, the warrants lack probable cause because, among other things, the informant's reliability was not substantiated. Finally, Defendant contends the "good faith" exception under *United States v. Leon,* 468 U.S. 897, 922 (1984) does not apply. As such, the evidence must be excluded.

The Government responds that the officers had probable cause to make a warrantless arrest because an offense had been or was being committed. The Government concedes that officers "may not effect a warrantless arrest of a suspect in his hotel room unless the arrest and entry are supported by probable cause and exigent circumstances," including the prevention of destruction of evidence. (Doc. 55 at 5) (quoting *United States v. Granados*, 587 F. Supp. 2d. 1112, 1118-19 (D.S.D. 2008)). At the hearing, the Government stated that while exigent circumstances might have existed because of the presence of a small amount of drugs in room 808, it was not "pinning its argument" on the exigent circumstances presented by the possible destruction of evidence. The Government contends instead, that entry without a warrant was justified based on officer safety concerns, the information about other weapons, as well as the need to do a protective sweep of the entire hotel room.

The Government avers that the officers lawfully knocked on the hotel door and, when Defendant opened the door, took him into custody in the hallway without a search.

No arrest warrant was necessary, the Government argues, because the Government had probable cause to believe Defendant was in possession of a sawed-off shotgun. (Doc. 55 at 5-6.) The Government contends no search occurred until after officers returned with a warrant. The Government further contends that Officer Ehlers's recitation of the *Miranda* warnings reasonably conveyed Defendant's rights, which Defendant then waived. If the warnings were insufficient, the Government argues, the Court should only suppress Defendant's statements, not the physical evidence.

Next, the Government argues the search warrants for the hotel room and for the urine sample were supported by probable cause. The Court should not excise any information because "there was no unlawful search of the room because no search took place." (*Id.* at 9, 14.)

The Government also avers that the independent source doctrine permits admission of the evidence. That is, even if some material is excised from the warrants, the information provided by the CI that was corroborated by officers and Patterson's statements in the affidavit still establish probable cause for both warrants. (Gov. Ex. 55 at 10-12) (citing *United States v. Swope*, 542 F.3d 609, 613-14 (8th Cir. 2008)). Finally, the Government argues that even if the warrants were invalid, the *Leon* good faith exception to the exclusionary rule permits the admission of the evidence.

### B. The Warrantless Entry of the Hotel Room and Seizure of Defendant

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quotation omitted). "[A]n entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and sanctity of the home, and justify the same level of constitutional protection." *Mahlberg*

11

*v. Mentzer*, 968 F.2d 772, 775 (8th Cir. 1992) (quoting *Payton*, 445 U.S. at 588). Therefore, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). This protection begins at the entrance to the dwelling. *United States v. Vance*, 53 F.3d 220, 221-22 (8th Cir. 1995) (quoting *Payton*, 445 U.S. at 590) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). Although warrantless searches and seizures inside a home are presumptively unreasonable, there are exceptions to the warrant requirement "because the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City,* 547 U.S. at 403 (quotations omitted).

An individual invoking Fourth Amendment protection must have a justifiable, reasonable, or legitimate expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (quotations omitted). To attain this expectation of privacy, the expectation must be subjectively held and objectively reasonable, meaning it is one that society is prepared to recognize. *Id.* Society recognizes a reasonable expectation of privacy of individuals in their hotel rooms. *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). Thus, as a registered occupant of the hotel room, Defendant was protected by the Fourth Amendment from unreasonable searches and seizures. *United States v. Peoples*, 854 F.3d 993, 996 (8th Cir. 2017) ("[T]he Fourth Amendment's protection against unreasonable searches and seizures extends to a person's privacy in temporary dwelling places such as hotel or motel rooms.") (quotation omitted); *United States v. Conner*, 948 F. Supp. 821, 844-85 (N.D. Iowa 1996), *aff'd*, 127 F.3d 663 (8th Cir. 1997).

### 1.   The Search

The simple, baseline definition of a "search" under the Fourth Amendment is when "the Government obtains information by physically intruding on persons, houses, papers, or effects." *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quotation omitted). A

search also occurs when there is official intrusion into something "an individual 'seeks to preserve [] as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Carpenter v. United States*, ---U.S.---, 138 S. Ct. 2206, 2213 (2018) (quoting *Smith*, 442 U.S. at 740). When physical intrusion on a constitutionally protected area is present in a case, it is unnecessary for the Court to "inquire about the target's expectation of privacy." *Grady v. North Carolina*, -- U.S.--, 135 S. Ct. 1368, 1370 (2015) (per curiam).

I conclude that the entry by law enforcement into the hotel room when Officer Ehlers grabbed the Defendant and pulled him into the hallway and when the other officers entered the room constituted an intrusion on a constitutionally protected area. Unless this search was justified based upon the considerations below, it was presumptively unreasonable and the fruits of the search may be subject to exclusion.

**2.     *The Seizure***

"[M]ere police questioning does not constitute a seizure." *United States v. Barry*, 394 F.3d 1070, 1074 (8th Cir. 2005) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Rather, if a citizen is free to "ignore the police presence and go about his business," the encounter is not a seizure. *Id.* (quoting *Bostick*, 501 U.S. at 437) (internal citation omitted). A seizure only occurs when, "in the totality of the circumstances surrounding the encounter, a reasonable person would believe that [he] is not free to leave." *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998) (citing *United States v. Thompkins*, 998 F.2d 629 (8th Cir. 1993)). A seizure under the Fourth Amendment requires either physical force or submission to the assertion of authority. *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1208 (8th Cir. 2013) (quoting *California v. Hodari D.*, 499 U.S. 621, 627 (1991)). The physical force must be both willful and restrain the person's freedom of movement. *Id.* (quotations omitted). "[S]eizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586.

However, "the warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment." *United States v. Council*, 860 F.3d 604, 608 (8th Cir. 2017) (quoting *United States v. Santana*, 427 U.S. 38, 42 (1979)) (internal brackets omitted).

I find that Defendant was "seized" under the Fourth Amendment when he was grabbed from inside of his hotel room and placed on the floor in the hallway. Despite Officer Ehlers's statements that Defendant was simply being "detained," Defendant was immediately handcuffed and read his *Miranda* rights. *Miranda* warnings are only necessary when defendants are questioned in custodial situations. *United States v. Layne*, 973 F.2d 1417, 1421 (8th Cir. 1992) ("A *Miranda* warning requirement is not applicable to every situation where law enforcement asks questions, rather it is the compulsive or coercive aspect of custodial situations that trigger *Miranda*."). Officer Ehlers's conduct was consistent with a seizure rather than a mere detention to sort out the facts or so that officers could conduct a protective sweep. *Contra United States v. Hubbard*, No. CRIM 09-272 JMR/JJK, 2009 WL 5103226, at *2 (D. Minn. Dec. 17, 2009) (officers temporarily detained residents of home in living room while they conducted protective sweep of rest of house and told residents they were free to leave after sweep was completed).

Under these facts, Defendant was required to submit to Officer Ehlers's assertion of authority. *Atkinson*, 709 F.3d at 1208. No reasonable person in Defendant's position would have believed he was free to leave. *Pena-Saiz*, 161 F.3d at 1177. Officer Ehlers may have used the word "detained" to liken the encounter to a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). Although handcuffs may be used during a *Terry* stop as a reasonable precaution to protect officer safety, *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006), the facts here do not support the conclusion that this was "mere questioning" allowed during a *Terry* stop. The totality of the circumstances demonstrate

that no reasonable person would have believed he was free to leave. Nothing about the interaction would show Defendant could "ignore the police presence and go about [his] business." *Barry*, 394 F.3d at 1074.

Because Defendant was seized, the remaining questions to be decided are whether Defendant was in a "public place" at the time of the seizure and whether the arrest was based upon probable cause.

### a. Public Place

An individual is in a "public place" when the individual is "not in an area where [he or she has] any expectation of privacy." *Council*, 860 F.3d at 610 (quoting *Santana*, 427 U.S. at 42-43). "The doorway of an individual's . . . hotel room may be a public place for the purpose of making a warrantless arrest if the individual has come to stand in the doorway voluntarily." *Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir. 1989) (citation omitted). This action is not "voluntary" when an individual is compelled to stand in the doorway or "when officers deceive an individual in order to bring him to the door." *Id.* The Eighth Circuit has cautioned that the court should not "become preoccupied with the exact location of the individual in relation to the doorway" when deciding this issue. *Id.* Rather, "the crucial issues involve the individual's reasonable expectation of privacy and whether that individual came to the doorway voluntarily." *Id.*

I conclude that Defendant had a reasonable expectation of privacy and only opened the door in response to a ruse intended to lure him to the door. I further conclude that Defendant would have a reasonable expectation of privacy in the room and a reasonable expectation his person would be free from seizure despite having opened the door to what he was led to believe was a hotel employee.

I find that the entry by law enforcement into the hotel room when Officer Ehlers grabbed the Defendant and pulled him into the hallway and when the other officers entered the room constituted an intrusion on a constitutionally protected area.

15

Accordingly, the hotel room retained the characteristics of a private place and unless this search was justified based upon the considerations below, it was presumptively unreasonable and the fruits of the search may be subject to exclusion.

### b.      *Probable Cause*

Officers may not effect a warrantless arrest in an individual's home without both probable cause and exigent circumstances. *Duncan*, 869 F.2d at 1102 (8th Cir. 1989). Probable cause exists at the time of the arrest "where the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense is being or had been committed by the person to be arrested." *United States v. Kelly*, 329 F.3d 624, 628 (8th Cir. 2003) (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979); *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001)).

Here the Government alleges law enforcement had probable cause to believe Defendant possessed a sawed-off shotgun in violation of state and federal laws.   The officers were in possession of information from a CI that Defendant possessed such a shotgun. Officer Ehlers saw the shotgun in Patterson's car where Defendant had been seen earlier in the day. I conclude the facts from the CI, corroborated by the officers' own observation, were sufficient to support probable cause.   Thus, the first element of the test to determine if a warrantless arrest may be effected has been met and I turn to the question of exigent circumstances.

### c.      *Exceptions to the Warrant Requirement*

The Government alleges that the existence of probable cause and exigent circumstances justified the warrantless search and seizure. The exigent circumstances exception "permits an officer to enter a home if he or she acts with probable cause in the presence of exigent circumstances." *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005).   "Exigent circumstances are present where lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed."  *Williams*, 521 F.3d at 908

16

(citing *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996)). When a search or seizure is conducted without a warrant, the Government "has the burden of justifying the warrantless entry under one of the recognized exceptions." *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980).

"The question . . . is not whether there were actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir. 1994) (citation omitted). The court considers "the circumstances that confronted police at the time of entry" to evaluate whether the warrantless entry was justified. *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005). The Government alleges the exigencies here were either officer safety, that evidence was about to be destroyed, or the need to conduct a protective sweep. Thus, the questions to be decided are whether the officers could reasonably have believed there was probable cause and either (a) the officers' safety was at risk, (b) evidence was about to be destroyed, or (c) there was a need to make a protective sweep of room 808. As discussed above, I have already determined that the officers had probable cause to enter room 808. The following analyses will determine whether exigent circumstances existed based on officer safety of potential destruction of evidence.

### i. Exigent Circumstances

The Government's resistance makes only a passing reference to the exigencies it relies upon to justify the warrantless search. The Government appears to be relying more on the assertion that Defendant was taken into custody in the hallway after "[h]e voluntarily opened the door." (Doc. 55 at 6.) The Government's Resistance cites *Granados* and asserts, "'Exigent circumstances'" can include the need to prevent the destruction of evidence. *Id*. (citing *Granados*, 587 F. Supp. 2d at 1119). This is merely conclusory. The Government does not say what evidence it thought might be destroyed

17

if police officers waited for a warrant or what dangers would have necessitated a protective sweep.

## A.    Officer Safety

"A legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm." *United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006) (citing *United States v. Hill*, 430 F.3d 939, 941 (8th Cir. 2005)). "The analysis of whether this exception to the warrant requirement has been made out is an objective one focusing on what a reasonable, experienced police officer would believe." *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003) (quotation omitted). Officers may be justified in entering a hotel room when there is a "reasonable belief that it was necessary to protect the [officers] and the public from a possible violent action from [the occupant of the room]." *United States v. McConnell*, 903 F.2d 566, 570 (8th Cir. 1990).

For example, in *United States v. Williams*, law enforcement had engaged an informant to sell the defendant fake cocaine. 633 F.2d 742, 743 (8th Cir. 1980). Worried about their informant's safety once the cocaine was tested and found to be fake, law enforcement entered Williams's home and arrested him without a warrant. *Id*. *Williams* found there was reasonable fear of harm to the informant, and thus, exigent circumstances justified the entry and warrantless arrest. *Id*. at 744.

In the case at bar, the Government offered little support for the assertion that Defendant presented a threat to safety while he was in his hotel room. He had made no threats and he had not brandished the shotgun that was, in any event, left in Patterson's car. The officers did know another person was in the room and had intelligence the Defendant possessed bladed weapons. Nevertheless, I recommend the Court find there were no exigent circumstances based on officer safety. The Government's reference at the hearing to the need to make a protective sweep for officer safety confuses the issue.

18

The Government needs to show the exigent circumstances that justifies law enforcement's entry into the hotel room in the first place. Once law enforcement has entered, a protective sweep for officer safety may be justified. *See United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009) (citing *Maryland v. Buie*, 494 U.S. 325, 337 (1990)). However, law enforcement cannot justify the decision to enter in the first instance by the need to protect themselves once they are in.

The case at bar can be distinguished from another hotel room warrantless-entry case wherein the Eighth Circuit held that the entry was supported by exigent circumstances. *See McConnell*, 903 F.2d 566. In *McConnell*, a police officer was called when hotel staff found a loaded gun left behind when a guest switched rooms. *Id.* at 568. The officer talked to the guest in the hallway because he would not allow the officer to enter the room, stating that his "girlfriend was asleep." *Id.* at 569. The guest gave the officer an obviously false I.D., and then offered his real I.D., when told he was "caught." *Id.* The guest lived in the same town, which the officer found suspicious. *Id.* The officer gave the guest time to gather his belongings before hotel staff evicted him for registering with a false I.D. The officer waited in the hall several minutes for the guest's alleged girlfriend to get dressed before he admitted he was alone. *Id.* This further aroused the officer's suspicions. *Id.* After several more minutes, the officer announced through the now-partially-opened door that he was entering the room. *Id.* The officer there saw drugs in plain view. *Id.* He entered the room "based upon fear of harm to himself, hotel personnel, and hotel guests" because the man had brought at least one loaded gun into the hotel; the man had lied to him and hotel staff about his identity and about having a travel companion in an attempt to keep the officer out of his room and, perhaps, "to give him time to prepare to take some action against the officer or [other] guests." *Id.* at 569-70. In addition, the guest's "failure to realize his misplacement of a single loaded revolver" might have been an "indication that he had additional guns with

him." *Id.* at 570.  Moreover, other guests could have been put at risk if he left the scene to obtain a search warrant.  *Id.*

The only evidence of possible danger the officers had in the case at bar was the tip from Investigator Del Valle stating that Defendant had a sawed-off shotgun, which was secured in the parking lot by the time officers entered the casino hotel.  Defendant was reported to have only a "personal-use" amount of methamphetamine, which is not a public safety concern that rises to the level of an exigent circumstance.  Although Defendant was reported to have multiple blades, neither the officers nor the Government relies on the blades as a basis for exigent circumstances for entry into the hotel room.  I do not find that the presence of blades, alone, provides a basis for exigent circumstances unless there is a threat of imminent harm.  *See Conner*, 948 F. Supp. at 849 (finding that fact that officers could have believed suspects had weapons did not establish exigent circumstances).  Furthermore, as discussed above, the only firearm officers knew was associated with Defendant was locked in Ms. Patterson's car at the time officers sought entry into room 808.

The Government argues that "[b]etween the information provided by the confidential source and the officers [sic] own observations, there was probable cause to believe defendant had committed a crime [(i.e., possessing a sawed-off shotgun)] and officers were justified in arresting him without a warrant."  (Doc. 55 at 6.)  While this may be true, this did not create an exigent officer safety situation because the shotgun was already secured.  In addition, while the officers had probable cause to arrest Defendant, I am not convinced that the arrest could not have been effected by securing the hotel room and obtaining an arrest warrant.  The room was on the eighth floor. The only way in or out was the door.  A judge was available as shown by the fact the warrants Officer Ehlers eventually obtained were signed at 3:05 a.m., 3:10 a.m., and 3:11 a.m. on October 11, 2018.  (Gov. Ex. 2, 3, 4.)  In short, "[t]his was not a case involving hot

20

pursuit." *See United States v. Houle*, 603 F.2d 1297, 1300 (8th Cir. 1979) (holding that officers' deliberate four-hour delay between tip and entry, during which time they did not seek warrants, indicated that officers did not actually believe the defendant would escape or destroy the evidence in his possession). There was no reason Defendant's arrest had to happen immediately. As with Ms. Patterson's car, securing room 808 was simply a matter of stationing one or two officers outside the door. Therefore, I recommend the District Court find that officer safety was not an exigent circumstance that justified a warrantless entry into Defendant's hotel room.

### B. Destruction of Evidence

"[T]he exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 469 (2011). "The risk that evidence will be destroyed during the time required to obtain a search warrant can be an exigent circumstance that justifies a warrantless entry." *Leveringston*, 397 F.3d at 1116 (citations omitted). "When the exigency at issue is destruction of evidence, police officers must demonstrate a sufficient basis for an officer to believe that somebody in the [hotel room] will imminently destroy evidence." *United States v. Ramirez*, 676 F.3d 755, 760 (8th Cir. 2012) (citation omitted). The inquiry is objective and asks, "whether a reasonable, experienced police officer would believe evidence was in danger of removal or destruction." *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (citation omitted). *Cisneros-Gutierrez* held:

> After arriving at the house and announcing themselves, the officers witnessed evasive behavior. Gerardo and Alfonso consulted one another, following which Gerardo's feigned confusion appeared to be a delaying tactic during which Alfonso took several plastic bags to the kitchen sink and disposed of their contents. Taken together these circumstances justified the officers' warrantless entry.

*Id.*

The instant case presented no such circumstances. The evidence at most showed that the officers heard people moving in the room. Officer Ehlers testified that none of the noises implicated the destruction of evidence. Innocuous moving noises from the other side of the door do not constitute exigent circumstances. *See, e.g.*, *Ramirez*, 676 F.3d at 763 (holding that no exigent circumstances existed because at the time officers sought to gain entry to hotel room by swiping the key card, "they had no indication whatsoever that there was any activity at all in the hotel room, let alone any activity that might lead them to believe that the occupants inside might imminently destroy evidence," in fact, the officers heard "no sounds at all" from the room); *United States v. Sallis*, No. 17-CR-2017-LRR-1, 2017 WL 2819973, at *8 (N.D. Iowa June 29, 2017) (officers heard nothing from apartment to justify warrantless entry based on possible destruction of evidence), *R. & R. adopted* 2017 WL 3388184 (N.D. Iowa Aug. 7, 2017), *aff'd*, 920 F.3d 577 (8th Cir. 2019). *But see United States v. Clement*, 854 F.2d 1116, 1120 (8th Cir. 1988) (holding that magistrate judge and district court could reasonably find that officers could think evidence would be destroyed when they heard "scurrying" through hotel room door). Defendant was reported to be in the possession of only a user quantity of methamphetamine. The officers did not testify regarding any statements or sounds they heard that indicated destruction of evidence, only movement. The Government has pointed to no case that establishes that probable cause to believe a drug user in possession of a user-quantity of a controlled substance justifies a warrantless search to prevent destruction of the evidence through consumption. Therefore, I recommend the District Court find that destruction of evidence was not an exigent circumstance that justified a warrantless entry into Defendant's hotel room.

### C.    Protective Sweep

I previously concluded that actions of the officers constituted an intrusion on a constitutionally protected area. A "protective sweep" is an exception to the warrant

requirement of the Fourth Amendment. *Maryland v. Buie*, 494 U.S. 325, 327 (1990); *United States v. Alatorre*, 863 F.3d 810, 813 (8th Cir. 2017) (citing *Buie*, 494 U.S. at 327). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* (quoting *Buie*, 494 U.S. at 327). "The government bears the burden of proving that [the protective sweep] exception to the search warrant requirement applies." *Green*, 560 F.3d at 856.

The problem with the Government's reliance on the necessity of making a protective sweep is twofold. First, the Fourth Amendment permits "the protective sweep if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Alatorre*, 863 F.3d at 813 (quoting *Buie*, 494 U.S. at 327) (alterations omitted). While the instant case *may* present articulable facts that reasonably justified the sweep (e.g., suspicion of firearms and the probable presence of another person), the Government's argument made no effort to articulate the basis for the belief that a protective search was warranted in its brief or via witness testimony.

Second, the occasion to make a protective sweep does not obviate the need to establish the exigent circumstances to enter the protected area in the first instance. The Government did not argue or proffer evidence that the officers reasonably believed they were in any danger from any occupant of the room *before* they persuaded Defendant to open the door and entered. This case contrasts with the situation in *Alatorre* where law enforcement executed a valid arrest warrant on the defendant's home, announced their presence, and persuaded the defendant to come to the door after hearing conversation and seeing movements through the blinds "consistent with multiple people in the house." 863

F.3d at 812. The defendant was arrested and placed in handcuffs on the porch. *Id.* The court held that because of their articulated beliefs about the possibility of an attack from someone in the residence due to hearing conversation while waiting for someone to answer the door, law enforcement's "two minute" protective sweep of the residence after defendant was arrested and his girlfriend was also secured on the porch was justified. *Id.* at 814-15.

In the instant case, even if the Court assumes articulable facts warranting the officers' belief they were in danger once the door was opened, such belief is not sufficient to justify their warrantless entry or their decision to remain for a lengthy period searching with a flashlight and interviewing an occupant. These actions went far beyond the "quick and limited search . . . incident to an arrest and conducted to protect the safety of police officers or others" authorized under the Fourth Amendment. *See Buie*, 494 U.S. at 327.

The Government cannot, under these circumstances justify the warrantless entrance into room 808 based on the need to conduct a protective sweep.

### ii. Conclusion

In conclusion, I find that there were not exigent circumstances that justified entering Defendant's hotel room without a warrant on October 11, 2018. Therefore, the second element of the test has not been met and the warrantless entry into room 808 violated the Fourth Amendment.

### d. The Seizure of Defendant was Unconstitutional

Based on the preceding analyses, I find that although there was probable cause to arrest Defendant, no exigent circumstances existed on October 11, 2018 to justify entering Defendant's hotel room by force or by ruse without a warrant. Therefore, I recommend finding that Defendant was seized in violation of his Fourth Amendment right to be "secure in [his] person [and] house . . . against unreasonable . . . seizures."

## C.    Suppression of Evidence

Evidence obtained as a result of an unconstitutional search or seizure must be suppressed as well as any evidence later discovered to be an illegal "'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). "Any evidence secured through an unreasonable, hence illegal, search and seizure may not be used in a federal prosecution . . . nor may the fruit of such tainted evidence be admitted against the defendant whose privacy rights were originally violated." *Conner*, 948 F. Supp. at 829 (citing *Weeks v. United States*, 232 U.S. 383 (1914); *Wong Sun*, 371 U.S. at 484-88). However, the evidence must be suppressed only if the "illegality is at least a but-for cause of obtaining the evidence." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011).

> In order to determine whether challenged evidence is the fruit of an illegal search or seizure, "the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Marasco,* 487 F.3d 543, 547 (8th Cir. 2007). Once the defendant comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government. *Alderman v. United States*, 394 U.S. 165, 183 (1969). In other words, the government must show the evidence obtained after the illegal search was not "come at by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.

*Id*. In the case at bar, I have already determined that the entrance into Defendant's hotel room was a search in violation of the Fourth Amendment and that the seizure of Defendant immediately upon encountering him at his hotel room door was an unconstitutional seizure. Therefore, Defendant's and Ms. Patterson's statements and evidence seized from Defendant and room 808 may be excluded if Defendant "is able

to first prove a factual nexus between the constitutional violation and the challenged evidence" *Id.* (citation omitted) and if the Government cannot show that the evidence is untainted.

### 1. *Defendant's Statements*

Defendant made incriminating statements in the hallway of the hotel while speaking to Officer Ehlers and at the police station while being interviewed by Officer Scarbrough. "Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) (citing *Wong Sun*, 371 U.S. at 485).

### a. *Defendant did not Waive his Miranda rights*

Defendant argues that the *Miranda* warning Officer Ehlers administered in the hallway was inadequate because of "the hastily mumbled wording and specific circumstances [that] caused Ehlers not to reasonably convey Mr. Zarate's *Miranda* rights." (Doc. 47-1 at 10.) Under *Miranda*, an individual in custody must be advised of the following before being questioned:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Any individual subject to custodial interrogation, meaning "questioning initiated by law enforcement officers after a person has been taken into custody," must be informed of these rights. *Id.* at 444. An individual is in "custody" if there "was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Interrogation "refers to express questioning and to words or conduct that officers should know is

26

'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

"The four warnings *Miranda* requires are invariable, but [the] Court has not dictated the words in which the essential information must be conveyed." *Florida v. Powell*, 559 U.S. 50, 60 (2010). When reviewing the adequacy of the warnings, the "inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quoting *California v. Prysock*, 453 U.S. 355, 361 (1981)) (alterations in original).

The Government bears the burden to prove a waiver of these rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). To make this determination, courts consider the following personal characteristics of the defendant:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008) (quoting *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000) (internal citation omitted). The courts consider the following environmental characteristics in which consent to the interview was given:

> [W]hether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

27

*Id.* (citation omitted & bracket in original). The factors are not applied "mechanically," but only serve as guidance for the court's analysis. *Id.* A valid *Miranda* waiver must be voluntary, knowing, and intelligent. *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). A voluntary waiver is the product of "free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). A waiver is knowing and intelligent if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

This issue presents a difficult decision for the Court. Ultimately, I recommend that the District Court find that Defendant did not waive his *Miranda* rights in the hallway. First, I consider the circumstances in which the waiver was given. A defendant who is awakened, pulled from his hotel room in the middle of the night, and placed in handcuffs would have been hard pressed to immediately provide a voluntary, intelligent, and knowing relinquishment of his right against self-incrimination. Although Officer Ehlers's report at Government Exhibit 1 stated, "I read Zarate his *Miranda* Rights. He stated he understood," (Gov. Ex. 1 at 1), it is clear from the video and from Officer Ehlers's admission at the hearing that he recited a version of the *Miranda* warning from memory. The distinction between "reading" and "reciting" is not significant for purposes of determining whether the warning was adequate. I find that it was adequate. Although rushed, the words of the *Miranda* warning are understandable. However, a distinction exists and this discrepancy casts some doubt on the accuracy of Officer Ehlers's report.

Second, and more significant, is the discrepancy between Officer Ehlers's report of how Defendant acknowledged his understanding of his rights and his testimony. Contrary to his report, which states Defendant "stated he understood," Officer Ehlers testified at the hearing that Defendant "nodded his head" to indicate yes. (Ehlers Hr'g

Test.)  Neither the head nod nor the statement acknowledging Defendant's understanding is recorded on the audio or video footage offered into evidence.  After the alleged head nod, Officer Ehlers commenced asking questions.  Defendant did not answer right away. Instead, Defendant continued to ask Officer Ehlers why officers were there.  Officer Ehlers told Defendant that he was merely being "detained" and that this was "protocol." Although Defendant is twenty-five years old and had previous experience with *Miranda* warnings,[4] Defendant had just been awakened in the middle of the night, pulled out of his hotel room, placed on the floor, and handcuffed.  In addition, the *Miranda* warning was delivered immediately upon Officer Ehlers securing Defendant.

Moreover, Officer Ehlers testified that although Defendant did not demonstrate all the signs of being under the influence of methamphetamine, such as increased heart rate, sweating, and hyperactivity, he did believe that Defendant had dilated pupils.  (Ehlers Hr'g Test.)  His concern about Defendant's condition even prompted Officer Ehlers to ask Ms. Patterson about Defendant's drug use because Defendant seemed "a little shook up." (Gov. Ex. 8 at 16:34.)  The Eighth Circuit has declined to adopt a per se rule that a *Miranda* waiver made under the influence of drugs is involuntary. *United States v. Goodwin*, 242 F.3d 377, 2000 WL 1852624, at *1 (8th Cir. 2000) (unpublished table decision) (citing *United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir.1998)).  To determine the voluntariness of a defendant's statements, courts consider the totality of the circumstances, including the defendant's capacity to resist any police pressure.  *Id.* For example, *Goodwin* affirmed the denial of a motion to suppress made by a defendant who was interviewed when he was under the influence of cocaine and heroin because agents testified the defendant "seemed to be in his right mind and denied he was under

_____

[4] Defendant told Officer Ehlers that he was scheduled to meet his probation officer the next day. This indicates past involvement with law enforcement that likely entailed an arrest and *Miranda* warning.

the influence of drugs." *Id.* In the case at bar, Officer Ehlers testified that Defendant exhibited at least one of the signs of being under the influence of drugs, dilated pupils. Defendant was also "shook up," which, although Officer Ehlers did not feel rose to the level of hyperactivity, did put him on alert that Defendant was possibly impaired. (Gov. Ex. 8 at 16:34.) In spite of these concerns, Officer Ehlers never asked Defendant if he was under the influence of controlled substances. (*Id.*)

Under these conditions, and with the lack of either a verbal or auditory response, I find that although the *Miranda* warning was adequate, Defendant did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. However, a finding that Defendant did not waive his *Miranda* rights does not end the inquiry.

Statements that are sufficiently attenuated from the original taint need not be suppressed. *Riesselman*, 646 F.3d at 1080. In *Riesselman*, a defendant's Fourth Amendment rights were violated when officers searched his person while conducting a search of his home pursuant to a valid search warrant that did not authorize searches of any persons. *Id.* at 1075. The officers found contraband on the defendant's person. The defendant was given his *Miranda* warning and said he would speak to officers. *Id.* Before anyone questioned the defendant, he asked Officer Heidman if he should have a lawyer, to which Heidman replied that "they were 'just talking,' but indicated he would inform the prosecutor if [the defendant] cooperated with the questioning." *Id.* Heidman then re-*Mirandized* the defendant, the defendant agreed to speak to Heidman, and the defendant made incriminating statements. *Id.* The defendant sought to suppress the statements he made to Heidman as fruit of the poisonous tree. *Id.* at 1079. The government conceded that the original search of the defendant violated his right to be free from unreasonable searches and seizures. *Id.* at 1079. The Eighth Circuit affirmed the district court's holding that the defendant offered "no convincing evidence to show he was influenced by the finding of drugs

30

on his person to make incriminating statements to the officers." *Id.* The court reasoned that the defendant freely spoke with the officer about legal issues beyond the contraband that was found on his person. *Id.* at 1079-80. Based on this evidence, the court held that the defendant "failed the but-for test because he did not provide sufficient evidence to prove a nexus between the illegal search of his person and his statements made to the officers" and affirmed the district court's decision. *Id.* at 1080.

### b. Statements Made in the Hallway

The first issue is whether there was a sufficient factual nexus between the constitutional violation and the challenged evidence. *See United States v. Yorgensen*, 845 F.3d 908, 913 (8th Cir. 2017). The relevant constitutional violation here was the seizure of Defendant. This happened mere seconds before Officer Ehlers began interviewing Defendant, who, although not obviously under the influence of drugs, was apparently just awakened and "shook up." (Gov. Ex. 8 at 16:34.) Partway through the interview, Defendant told Officer Ehlers he had been asleep. (*Id.* at 5:23.) In the hallway, Officer Ehlers refused to answer Defendant's questions regarding why he was being detained. Rather, after quickly reciting Defendant his *Miranda* warning, Officer Ehlers immediately asked, "What illegal items do you have in the room? Just be straight with me. Honesty is going to be the best route right now." (*Id.* at 4:28.) A few seconds later, Officer Ehlers said, "Obviously, we think something is going on." (*Id.* at 4:38.)

Officer Ehlers continued to push Defendant, accusing him of having contraband in his room until he finally told Defendant that he was getting a search warrant for room 808. At that point, Defendant, who had previously been questioning Officer Ehlers as to what had brought him to room 808, stated, "I fucked up," and admitted that he had a .380 handgun in the room. (*Id.* at 6:38, 7:06.)

31

I find that unlike the defendant in *Riesselman*, Defendant has shown that the constitutional violation was the but-for cause of his statements. But-for being removed to the hallway, Defendant would not have been in a position to speak to Officer Ehlers at all. Moreover, Defendant only talked to Officer Ehlers about being dragged out of his room and only about the reason for the officers' presence, which distinguishes this case from *Riesselman*. *Contra Riesselman*, 646 F.3d at 1079 (affirming district court's decision on defendant's motion to suppress and noting that the district court found no evidence that defendant "would not have spoken to the officers if the drugs had not been discovered" during the illegal search of his person). In fact, Defendant tried to ask questions instead of answer questions before he admitted to having the .380. He only admitted to having the gun once he knew discovery of it was inevitable because of the warrant, as evidenced by his resigned statement, "I fucked up." (Gov. Ex. 8 at 6:38.) Therefore, that statement was made in direct response to Officer Ehlers's statement during the unconstitutional seizure and interrogation. In addition, as discussed above, Defendant did not provide a clear waiver of his *Miranda* rights, which also distinguishes Defendant's case from *Riesselman*.

"The second question is whether the attenuation doctrine applies." *Yorgensen*, 845 F.3d at 914. Evidence is admissible when the connection between the constitutional violation and the evidence is "remote or has been interrupted by some intervening circumstance." *Id.* (citing *Utah v. Strieff*, –– U.S. ––, 136 S. Ct. 2056, 2061, (2016)). To show that statements after an illegal search or seizure were voluntary to purge the taint, courts consider (1) whether *Miranda* warnings were given, (2) the "temporal proximity" between the constitutional violation and the statements, (3) intervening circumstances, and (4) the "'purpose and flagrancy of the official misconduct.'" *Riesselman*, 646 F.3d at 1080 (quoting *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006)). *Riesselman* held that even if the district court had erred in finding no

32

nexus between the Fourth Amendment violation and the defendant's later statements, it would have still affirmed because the government also showed that the statements were sufficiently attenuated from the constitutional violation that they were voluntary. *See id.*

In this case, I find that the statements are not sufficiently attenuated from the constitutional violation. Although a *Miranda* warning was given, I do not find that Defendant gave a knowing, intelligent, and voluntary waiver of his right to counsel or his right to remain silent. *See id.* (citing *Rawlings v. Kentucky*, 448 U.S. 98, 100 (1980), which reasoned that provision of a *Miranda* warning is an "important, although not dispositive" factor). This factor weighs against finding the evidence is attenuated.

When addressing temporal proximity, a short time between the constitutional violation and the statement may be enough to indicate that the statement was voluntary if other circumstances indicate the statement was "sufficiently an act of free will to purge the primary taint." *United States v. Palacios-Suarez*, 149 F.3d 770, 772-73 (8th Cir. 1998) (holding that consent was sufficiently an act of free will to purge the taint of the initial stop where the officer asked the defendant several times if he could search the vehicle nine minutes after the initial stop) (quotation omitted); *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1112 (8th Cir. 2007) (assuming defendant's consent was given only ten minutes after illegal stop does not "compel the conclusion that the consent was insufficient to purge the taint" without analyzing other factors). Here, Defendant's statement was made four and a-half minutes after his illegal seizure by Officer Ehlers. Officer Ehlers grabbed Defendant at 2:36 on Government's Exhibit 8 and Defendant admitted possession of the handgun at 7:06 on Government's Exhibit 8. This statement is more akin to a one made "immediately on the heels" of a constitutional violation than one purged of taint by passing time. *See United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006), *as amended on reh'g* (Oct. 31, 2006) (quoting *United States v. Duchi*, 906 F.3d 1278, 1285 (8th Cir. 1990)). This factor weighs against finding the evidence

is attenuated, especially because other circumstances do not indicate Defendant's statements were a product of free will.

I find that there were no intervening circumstances to remove the taint of the constitutional violation. The time Defendant spent with Officer Ehlers in the hallway constituted a continuing constitutional violation. *Contra Riesselman*, 646 F.3d at 1080-81 (listing cases that found the following constituted intervening circumstances: *Rawlings v. Kentucky*, 448 U.S. 98, 108 (1980) ("courteous" discussions); *United States v. Vega-Rico*, 417 F.3d 976, 980 (8th Cir. 2005) (a change of location and having an officer who was not involved in the initial constitutional violation conduct interview)). Officer Ehlers grabbed Defendant immediately after rousing Defendant from sleep. Officer Ehlers made it clear that "obviously we think something is going on" (Gov. Ex. 8 at 4:40), but refused to tell Defendant what that "something" was, despite Defendant's unanswered questions, even when he admitted to having a gun in the hotel room. There were no intervening factors to mitigate Officer Ehlers's insistence Defendant respond immediately. This factor weighs against finding the evidence is attenuated.

As to the purpose and flagrancy of the official misconduct, I find that because (1) officers knew they already had evidence of at least one crime secured in the vehicle, (2) the hotel room was on the eighth floor, (3) officers did not hear any suspicious activity from inside room 808 that signified the destruction of evidence, (4) officer safety was not an issue that justified entry into room 808, and (5) a judge was available who could sign a warrant, the officers' seizure of Defendant was effected without regard for Defendant's Fourth Amendment rights. In light of these facts, the Government offers little justification to proceed with the search and seizure immediately. Thus, this factor, too, weighs against a finding in favor of attenuation.

Based on this analysis, I find that the constitutional violation was the but-for cause of Defendant's statements and that there was no attenuation between the

34

violation and the statements. Therefore, unless the statements Defendant made in the hallway are admissible for some other reason, I recommend granting Defendant's Motion to Suppress as it pertains to the statements Defendant made in the hallway.

### c. Statements Made at the Waterloo Police Station

The statements Defendant made at the Waterloo police station must be suppressed, if at all, based on the same constitutional violations as the statements he made in the hallway—the seizure of Defendant and the invalid waiver of *Miranda* rights. The first issue is whether there was a sufficient factual nexus between the constitutional violations and the challenged evidence. *See Yorgensen*, 845 F.3d at 913.

At 1:34 a.m., Officer Ehlers asked Officer Scarbrough to interview Defendant at the police station and Officer Scarbrough did so almost immediately. Officer Scarbrough did not re-*Mirandize* Defendant because Officer Ehlers told him that Defendant had already been given the warning. (Gov. Ex. 1 at 6.) During this interview, Defendant made statements that he now seeks to suppress. Defendant spoke with Officer Scarbrough for approximately 18 minutes. The interview ended when Defendant asked for an attorney.

I find that but-for being in custody, Defendant would not have talked to Officer Scarbrough. As discussed above, Defendant was only in custody as a result of the original unconstitutional seizure. Moreover, Defendant did not expressly waive his *Miranda* rights. During the interview, Officer Scarbrough and Defendant discussed topics related to the investigation begun at the hotel. Officer Scarbrough dictated the direction of the conversation. It seems on the video of the interview that Officer Scarbrough did not know much more about the investigation than Defendant because he was not one of the officers involved in the events that occurred at the hotel.

"The second question is whether the attenuation doctrine applies." *Yorgensen*, 845 F.3d at 914. Again, to show that statements after an illegal search or seizure were voluntary to purge the taint, courts consider (1) whether *Miranda* warnings were given, (2) the "temporal proximity" between the constitutional violation and the statements, (3) intervening circumstances, and (4) the "purpose and flagrancy of the official misconduct." *Riesselman*, 646 F.3d at 1080 (quotation omitted). As discussed above, "the purpose and flagrancy of the official misconduct" factor weighs against applying the attenuation doctrine. However, the other factors require individual analyses.

By the time Defendant made his statements at the police station, several intervening circumstances had occurred that served to purge the taint of the constitutional violation. First, the police station is far removed from the hallway floor where the initial constitutional violation occurred. *See Riesselman*, 646 F.3d at 1080 (citing *Vega-Rico*, 417 F.3d at 980). Second, Officer Scarbrough was not one of the officers involved in the events at the Isle of Capri Hotel, and therefore was not involved in violating Defendant's Fourth Amendment rights. *See id.* Third, Officer Scarbrough was able to tell Defendant more about the situation than Officer Ehlers was willing to divulge so that Defendant was not completely in the dark. Fourth, although it was still the middle of the night, Defendant appeared awake and coherent when he spoke to Officer Scarbrough. I find that this factor weighs in favor of applying the attenuation doctrine.

Regarding temporal proximity, although Officer Scarbrough's interview of Defendant took place beginning at approximately 1:35 a.m., this was not immediately after he was seized. It was enough time to be transported to the police station, to sit alone in an interrogation room for a while and consider the circumstances before the interview commenced. (Gov. Ex. 9.) As the Supreme Court said in *Rawlings v. Kentucky*, "[a]lthough under the strictest of custodial conditions, such a short lapse of time might not suffice to purge the initial taint, we believe it necessary to examine the

precise conditions" under which the defendant made his statement. 448 U.S. 98, 108 (1980) (discussing a 45-minute time lapse and holding that under the totality of the circumstances, defendant's statements were "acts of free will"). The difference in tone between Officer Scarbrough's interview of Defendant and Officer Ehlers's questioning of Defendant is notable. Officer Ehlers was urgent and, while not threatening, certainly not forthcoming with information in his possession.[5] Officer Scarbrough was upfront with Defendant and even told him that some of his questions were designed to catch Defendant in lies. Although Defendant was in custody, he did not seem uncomfortable, as demonstrated by the tone of his voice and body language, when he is visible. This was not a situation in which Defendant made a statement on the heels of the constitutional violation. I find that this factor weighs in favor of finding attenuation.

Finally, although Defendant was not re-*Mirandized*, I find that he knowingly waived his right to remain silent when he spoke to Officer Scarbrough. As discussed above, Officer Ehlers's *Miranda* warning was adequate, even if Defendant's subsequent waiver at the hotel was deficient. Defendant had previous experience with the legal system. On the video, Defendant did not sound or appear to be under the influence or impaired such that he lacked the ability to waive his rights. (Gov. Ex. 10.) Defendant appeared sufficiently clear-headed by 1:35 a.m. to give a knowing, intelligent, and voluntary waiver of his *Miranda* rights when he spoke with Officer Scarbrough. *See United States v. Contreras*, 372 F.3d 974, 977-78 (8th Cir. 2004) (waiver of *Miranda* rights valid when defendant appeared to be sober and in control of his faculties); *Goodwin*, 2000 WL 1852624, at *1. Officer Scarbrough never indicated that he thought Defendant was intoxicated (Gov. Ex. 1 at 6), and there was no reason, based on the

---

[5] I do not imply that officers are required to provide information at their disposal as a matter of course in an interview or interrogation. The task at hand, however, is to determine whether the statements are attenuated. An officer's provision of information (or withholding) could be a consideration in that regard.

evidence before the Court, that he should have done so. Defendant answered questions appropriately, asked appropriate questions, and unequivocally invoked his right to an attorney. (Gov. Ex. 10.)

Defendant responded to both Officer Ehlers's questions and Officer Scarbrough's questions. I find a waiver here because of the factors just discussed. Defendant did not appear to be anxious or under any sort of duress when speaking to Officer Scarbrough as he did when he spoke to Officer Ehlers. The taint of the Fourth Amendment violation had been purged sufficiently to allow his voluntary discussion with Officer Scarbrough to indicate waiver of his right to remain silent. When a defendant has been advised of his *Miranda* rights, does not sign a waiver of rights or verbally waive his rights, but proceeds to voluntarily answer questions from law enforcement, he has engaged in a "course of conduct indicating waiver" of his right to remain silent. *Berghuis v. Thompkins*, 560 U.S 370, 386 (2010) (citation omitted); *see also United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997) (holding that defendant waived his Sixth Amendment rights by electing to answer officer's questions after being *Mirandized*) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. Chartier*, No. CR13-0018, 2013 WL 5719483, at *11 (N.D. Iowa Aug. 16, 2013) (holding that defendant waived his right to remain silent by making "knowing, voluntary statements" to police officer after receiving *Miranda* warning), *R. & R. adopted as modified*, 2013 WL 5719482 (N.D. Iowa Oct. 21, 2013) (this issue not addressed in objections to R. & R.), *aff'd*, 772 F.3d 539 (8th Cir. 2014); *United States v. Wetsch*, Crim. No. 12-0045 SRN/JJG, 2013 WL 1435228, at *29 (D. Minn. Feb. 8, 2013) (holding that defendant waived his right to remain silent by voluntarily speaking to officers, and reasoning that "the Eighth Circuit has regularly held that a custodial defendant's continued responses to question[s] after being advised of his rights constitutes a waiver") (citing *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009)), *R. & R. adopted*, 2013 WL 1435210

38

(D. Minn. Apr. 9, 2013). As long as Defendant's statements were not coerced, his statements functioned as a waiver of his right to remain silent.

I find that Defendant voluntarily waived his right to remain silent and that his statements to Officer Scarbrough were not coerced. Although not every *Griffith* factor weighs in the Government's favor, the totality of the circumstances show that Defendant understood his *Miranda* rights and voluntarily waived them. As discussed above, although Defendant was questioned in the middle of the night, he was awake by the time he was questioned in the police station. Defendant freely answered Officer Scarbrough's questions and by doing so engaged in a "course of conduct indicating waiver" of his right to remain silent. *Berghuis*, 560 U.S at 386. Importantly, when Defendant did not want to talk to Officer Scarbrough anymore, he invoked his right to counsel. This indicates that he was speaking voluntarily up until that point.

Defendant's waiver was also "knowing and intelligent" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 42. Defendant is twenty-five years old and, as discussed above, did not appear intoxicated or under the influence of drugs when questioned by Officer Scarbrough. Defendant responded promptly and appropriately to Officer Scarbrough's questions and asked appropriate questions of his own. Defendant appeared to equivocate by saying he did not know the names of friends who had provided him with drugs or guns or did not know the make and model of Ms. Patterson's car. It appeared he was being purposefully obtuse to protect other people not because he was impaired and could not remember. Having previously been arrested and on probation at the time of this incident, Defendant had some experience with the *Miranda* warning, his right to remain silent, and the consequences of talking to law enforcement. Importantly, on this video and on Government Exhibit 8, Defendant appears to be of at least average intelligence and obviously understands the English language. There is no argument or

evidence that his mental abilities or English-language aptitude are impaired. Under these circumstances, this factor weighs in favor of finding the evidence sufficiently attenuated from the violation.

Although Officer Ehlers's action weighed against finding attenuation, the other three factors weigh in favor of finding attenuation. Defendant's interview with Officer Scarbrough began 34 minutes after the original violation, rather than on the heels of the violation. In addition, several intervening circumstances occurred that purged the taint of the violation: Defendant had time to wake up, was transported to a different location, was given time to sit alone and think for a bit before he was questioned, and then was questioned by an officer who was not involved in the constitutional violation. Finally, Defendant was previously given a valid *Miranda* warning, and he invoked his right to counsel when he no longer wanted to speak to Officer Scarbrough without a lawyer.

In *United States v. Tolbert*, the court granted in part and denied in part a motion to suppress statements. The court granted the motion as to the defendant's un-*Mirandized* statements related to methamphetamine found in his coat pocket. No. CR06-4021-MWB, 2006 WL 3487457, at *4 (N.D. Iowa Dec. 4, 2006), *R. & R. adopted*, 2006 WL 3775900 (N.D. Iowa Dec. 21, 2006). The court denied the motion as to the defendant's later *Mirandized* statements related to the same methamphetamine and his role in a distributing the drug because "[i]n these circumstances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Id*. at *5 (quoting *Oregon v. Elstad,* 470 U.S. 310, 310-11 (1985) (quoting *Wong Sun,* 371 U.S. at 486). In effect, the same is true in the case at bar. Defendant gave a knowing, intelligent, and voluntary waiver of his *Miranda* rights at the police station. His statements about the same subjects after waiving his *Miranda* rights at the police station, unlike his statements in the hallway, are admissible. Based on these

facts, I recommend denying Defendant's Motion to Suppress as it pertains to statements made at the Waterloo police station.

**2.      *Ms. Patterson's Statements***

Ms. Patterson made statements that could be incriminating to Defendant while she was in room 808 with Sergeant Duncan and two other police officers.  Defendant seeks to suppress these statements.  Specifically, Defendant wants to suppress her statements that there was a sawed-off shotgun and a scale in her vehicle, that there was marijuana in room 808, and that Defendant had been using drugs during their relationship.

There is no dispute that Defendant had the same expectation of privacy in room 808 that he would have in his own home.  Based on this right, Defendant asserts that he also has the right to have the statements Ms. Patterson made to Sergeant Duncan suppressed because no one gave the officers permission to enter and her statements are fruits of an impermissible search.  For support, Defendant relies on the Supreme Court's recent decision in *Byrd v. United States*, ---- U.S.----, 138 S. Ct. 1518 (2018), in which the Court held that a driver who is in lawful possession of a rental car, but not listed on the rental agreement, has a reasonable expectation of privacy while in the car.  *Id.* at 1531.  The Court reasoned that although the Fourth Amendment concept of standing can be "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search," it should "not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits" of the case.  *Id.* at 1530  (citing *Arizona Christian School Tuition Org. v. Winn*, 563 U.S. 125, 129 (2011)).

The Government argued that Ms. Patterson's statements need not be suppressed because Fourth Amendment rights are personal and may not be asserted on behalf of another individual.  For support, the Government cites *United States v. Douglas*, 744 F.3d 1065, 1071 (8th Cir. 2014).  However, *Douglas* can be distinguished.  In *Douglas*,

41

the defendant asserted Fourth Amendment privacy rights over property belonging to his aunt and uncle because he had permission to be on the property. *Id.* at 1070. *Douglas* held that the defendant did not possess the same privacy interest in that property as his aunt and uncle and could not "vicariously assert their rights" merely because he had permission to access the land, especially when the defendant disclaimed ownership of the bag containing the contraband at issue. *Id.* at 1068, 1071-72. As discussed, it is undisputed that Defendant had the same privacy interest in room 808 as a property owner and, in this case, the same privacy interest as Ms. Patterson because she was also a guest in room 808.

The case at bar is more analogous to *United States v. Dearing*, in which the defendant filed a motion to suppress evidence seized and statements his girlfriend made during a search of the home the two shared. No. 3:11 CR 308, 2011 WL 6256957, at *1 (N.D. Ohio Sept. 21, 2011), *R. & R. adopted*, 2011 WL 6256933 (N.D. Ohio Dec. 14, 2011). The court denied the defendant's motion "to suppress all evidence found during these searches and the statements made by his girlfriend during the searches" because the girlfriend had authority to consent to the searches and she gave that consent "freely and voluntarily." *Id.* at **1, 3-4. In this circuit, the District of North Dakota declined to suppress a statement made by the girlfriend of a criminal defendant under somewhat similar circumstances. *See United States v. Hill*, 666 F. Supp. 174, 177 (D.N.D. 1987), *aff'd*, 864 F.2d 601 (8th Cir. 1988). In *Hill*, the girlfriend of a criminal defendant made a statement during a warrant search of the defendant's home that the defendant sought to suppress. *Id.* The court held that because the search was conducted pursuant to a valid warrant, neither the evidence seized during the search nor the girlfriend's statement would be suppressed.[6] *Id.*

---

[6] Although *Dearing* and *Hill* are more factually analogous to the case at bar than *Douglas*, the cases can also be distinguished. Unlike officers in the case the case at bar, the officers in *Dearing*

42

The courts addressing the motions in *Dearing* and *Hill* never questioned the defendants' standing to seek suppression of these statements. *See Dearing*, 2011 WL 6256957 at **1, 3-4; *Hill*, 666 F. Supp. 174 at 177. I agree with the approach of these courts. If law enforcement is in a place in which a defendant has a constitutional right to privacy, the defendant has standing to seek suppression of statements made by third parties in that place. *See Yousif*, 308 F.3d at 832 (verbal statements obtained in violation of the Fourth Amendment are subject to exclusion).

Having determined that Defendant has standing to seek suppression of Ms. Patterson's statements, I will analyze whether Ms. Patterson's statements should be suppressed. The first question is whether there was a sufficient factual nexus between the constitutional violation and the challenged evidence. *See Yorgensen*, 845 F.3d at 913. The relevant constitutional violation here was the warrantless search of the hotel room that intruded upon the seclusion of Defendant and Ms. Patterson. This happened immediately upon Defendant opening the door for officers. Ms. Patterson was handcuffed almost as soon as Sergeant Duncan entered the room. He then *Mirandized* her.

Unlike the situation in *Riesselman*, I find that the constitutional violation was the but-for cause of Ms. Patterson's statements. But-for having officers enter the hotel room, Ms. Patterson would not have talked to Sergeant Duncan at all. *Contra Riesselman*, 646 F.3d at 1079 (affirming district court's decision on defendant's motion to suppress and noting that district court found no evidence that defendant "would not

---

had the occupant's permission to enter the premises. 2011 WL 6256957 at ** 3-4. As discussed above, officers obtained entry to room 808 by ruse, which negated any voluntariness in Defendant's act of opening the door. Likewise, *Hill* can be distinguished because officers gained access to Defendant's home with a search warrant, something that was lacking in the case at bar. *See* 666 F. Supp. at 175.

have spoken to the officers if the drugs had not been discovered" during the illegal search of his person). I do not find Ms. Patterson's statements to have been voluntary. In other words, Ms. Patterson would not have approached police officers to make these statements or given them of her own volition in a less confrontational setting. She was alone in a room with three police officers. The officers never threatened or intimidated her, although they arguably surprised her in her sleep. Ms. Patterson said that she had only ever been arrested before for having a small amount of marijuana. Under these circumstances, she was obviously nervous. She continually made statements to the effect that she was trying to do well and help Defendant do well. I find that but for the situation in which the search placed her, she would not have made the statements Defendant seeks to suppress. Moreover, all of Ms. Patterson's statements were related to evidence found in the vehicle, her relationship with Defendant, or evidence that officers would find during a search of room 808, rather than other investigative tracks, which distinguishes this case from *Riesselman*. 646 F.3d at 1079-80. Accordingly, I find that but-for the Fourth Amendment violation, Ms. Patterson would not have made the statements she made.

As previously discussed, using the four factor test, "[t]he second question is whether the attenuation doctrine applies." *Yorgensen*, 845 F.3d at 914.

In this case, I find that the attenuation doctrine does not make the statements admissible. A *Miranda* warning was given only seconds after entry. Ms. Patterson clearly stated that she had been read her rights before, that she understood her rights, and then chose to speak with Sergeant Duncan. *See, e.g.*, *United States v. Vanover*, 630 F.3d 1108, 1114 (8th Cir. 2011) (finding that defendant verbally acknowledged receiving *Miranda* warning and voluntarily, knowingly, and willingly waived those rights). *See also Riesselman*, 646 F.3d at 1080 (citing *Rawlings*, 448 U.S. at 100, which reasoned that giving *Miranda* warnings is an "important, although not dispositive" factor). Later

44

in the video, Ms. Patterson stated that she had previously been arrested for possession of marijuana, so she likely had at least one previous experience with a *Miranda* warning. This factor weighs in favor of attenuation.

When addressing temporal proximity, a short time between the constitutional violation and the statement may sometimes be enough to indicate the statements were voluntary if other circumstances indicate the statements were sufficiently an act of free will to purge the taint of the unconstitutional violation. *See Palacios-Suarez*, 149 F.3d at 772-73. Here, however, Ms. Patterson started making statements that implicated Defendant less than one minute after Sergeant Duncan entered the room and only twenty-eight seconds after she said she understood her *Miranda* rights. Thus, this statement was made "immediately on the heels" of the constitutional violation. *Lakoskey*, 462 F.3d at 975 (holding that even if the defendant's consent to search his home was voluntary, that did not "right the officers' constitutional wrong" because the defendant's acquiescence came "immediately on the heels of the illegal entry") (quoting *Duchi*, 906 F.2d at 1285). This factor weighs against attenuation.

I find that there were no intervening circumstances to remove the taint of the constitutional violation. Although Sergeant Duncan's and Ms. Patterson's conversation was relatively congenial and Sergeant Duncan removed her handcuffs after a few minutes, those circumstances did not constitute intervening circumstances of legal significance. Ms. Patterson was still alone with three officers in room 808. She was still speaking to the same persons who entered in violation of the Fourth Amendment, and she was obviously under some considerable surprise and stress. This factor weighs against attenuation.

As to the purpose and flagrancy of the official misconduct, I find that the officers did not hear any suspicious activity from inside room 808 that signified the destruction of evidence. I have already found that officer safety was not an issue and that a judge

was available who could sign a warrant. Therefore, the officers' entry into room 808 was unjustified and a done without due regard to the Fourth Amendment. Thus, this factor, too, weighs against attenuation.

Based on this analysis, I find that the constitutional violation was the but-for cause of Ms. Patterson's statements and that there was no attenuation between the violation and the statements. Therefore, unless Ms. Patterson's statements are admissible for some other reason, I recommend granting Defendant's Motion to Suppress as it pertains to Ms. Patterson's statements.

### 3. The Search of Defendant's Person

It is well-settled that police officers may conduct warrantless searches of criminal defendants "incident to a lawful arrest." *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010) (citation omitted). These warrantless searches are justified on the basis of officer safety and the preservation of evidence. *Id.*

Officer Ehlers searched Defendant as he was preparing to transport Defendant to the Waterloo police station. During this search, he found a glass pipe that Defendant now seeks to suppress. If Defendant's arrest was constitutional, the search of Defendant, too, was justified as a search incident to that arrest. I find, however, that the arrest was the fruit of the illegal seizure and therefore the arrest was unconstitutional. Therefore, I recommend suppressing the pipe unless it is admissible for some other reason.

### D. The Search Warrants for the Hotel Room and Defendant's Urine

At approximately 3:00 a.m. on October 11, 2018, Officer Ehlers obtained search warrants for room 808, the vehicle, and Defendant's urine. The warrant for the vehicle is not at issue. Defendant argues that evidence seized in the search of room 808 and the results of his urine test must be suppressed. Defendant argues that the search warrants for the hotel room and for his urine are not supported by probable cause absent the unlawfully obtained evidence and statements. Therefore, I must determine whether

46

probable cause supports the two search warrants without this evidence. I will first determine if probable cause supported the warrants as written.

"In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (quoting *Massachusetts v. Upton,* 466 U.S. 727, 728 (1984) (per curiam)). Therefore, "[r]eviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983)).

A substantial basis only requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability" that evidence of a crime will be found at the location. *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986). Probable cause is determined by looking at the totality of the circumstances. *Walden v. Carmack*, 156 F.3d. 861, 870 (8th Cir. 1998). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citing *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir. 1993)). Defendant bears the burden of proving that the warrants were issued without probable cause. *United States v. Houston*, 754 F. Supp. 2d 1059, 1071 (D.S.D. 2010).

*1.*     ***Warrant for Hotel Room***

The factual recitation of the affidavit in support of the application for the warrant to search room 808 is reproduced below.

47

[1.]     On October 10th, 2018 officers received information from confidential source in reference a male identified as Adrian Zarate being in possession of a sawed off shotgun and a quantity of methamphetamine while in a maroon 2004 Hyundai Sante [sic] Fe belonging to his girlfriend Sierra Patterson within the past 7 hours.

[2.]     On October 10th, 2018 at approximately 1700 hours Tri County Drug Task Force Investigator Diana Del Valle observed the maroon 2004 Hyundai Sante [sic] Fe traveling on Conger Street in Waterloo Iowa. Investigator Del Valle observed Adrian Zarate in the front passenger seat of the vehicle. The vehicle was bearing Iowa license plate HGX848. Investigator Del Valle then lost visual of the vehicle.

[3.]     Iowa Department of Transportation records showed the registered owner of the vehicle to be Sierra Patterson, the defendant.

[4.]     CS#1 advised that Zarate was staying at the Isle of Capri Casino.

[5.]     Sergeant Robert Duncan located the maroon 2004 Hyundai Sante [sic] Fe bearing Iowa license plate HGX848 unoccupied in the parking lot of the Isle of Capri Casino.

[6.]     Sergeant Duncan observed a sawed off single barrel shotgun in plain view next to the driver's seat inside the vehicle.

[7.]     The vehicle was secured at this time.

[8.]     Your affiant went into the Isle of Capri Casino and spoke with front desk staff who advised that Adrian Zarate was renting room 808. Your affiant called room 808 and spoke with a female and a male was identified himself as Adrian Zarate.

[ 9.]    Your affiant and officers from the Waterloo Police Department went to room 808 and Zarate came to the door. Officers secured Zarate and a female who was identified as Sierra Patterson in order to conduct a search warrant on room 808.

[10.]    Adrian Zarate had a glass pipe in his back pocket when he was detained. Your affiant read Zarate his Miranda Rights. Zarate stated that there was a .380 caliber handgun inside room 808.

[11.]    Sierra Patterson was read her Miranda Rights and stated that there was a sawed off shotgun in her vehicle along with a scale. Patterson said there was marijuana inside the room.

[12.]    Your affiant respectfully asks the Court to grant a search warrant for . . . room 808 [i]n order to look for firearms, ammunition, firearm boxes, and spent firearm shell casings; Methamphetamine or any other illegal narcotics, any paraphernalia associated with the use of Methamphetamine or any other illegal narcotics.

48

(Gov. Ex. 3 at 6.)  Defendant argues that this affidavit in support of the warrant to search room 808 must be redacted because the warrant was obtained using statements that are fruits of the poisonous tree, and makes all his substantive arguments based on a redacted affidavit.  (Doc 47-1 at 13-14.)

Although Defendant concedes that officers "quite likely had probable cause to search the car, on the basis of its containing a likely illegal and unregistered firearm" (*Id.* at 14), Defendant argues that the warrant to search room 808 was deficient because it was not supported by probable cause.  (*Id.* at 14-15.)  First, Defendant asserts that information related to the CI with whom Officer Del Valle worked was unreliable because Officer Del Valle had only worked with the CI for one month, the CI had only provided five tips and only one of those tips had so far led to an arrest, which Defendant posits may have been the arrest of Defendant and Ms. Patterson.  (*Id.* at 13-14.)  Second, the CI had provided his or her information to Officer Del Valle not to the officer who provided the sworn testimony upon which the warrant is based. (*Id.* at 14.)  Third, Defendant argues that the CI's tips were not "completely corroborated." (*Id.*)  Fourth, Defendant asserts that the representation in the warrant application that the CI had "otherwise demonstrated truthfulness" was not actually "demonstrate[ed] within the four corners of the warrant." (*Id.*)  Fifth, Defendant argues that the warrant application is missing any information about Officer Ehlers's training and experience. I will address each of Defendant's arguments in turn.  When addressing Defendant's substantive arguments, I will first analyze the warrants as written and then analyze the warrants with Defendant's proposed redactions.

"When the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v.*

*Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir.1999) (quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir.1995)) (alterations omitted). However, the affidavit should be interpreted in a common sense manner, and not in a hypertechnical manner. *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *Solomon*, 432 F.3d at 827. To that end, the judge "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008) (citation omitted).

In this case, Officer Ehlers's warrant application incorporated several documents in addition to the supporting affidavit itself. Therefore, the judge relied on not only the affidavit, but also "Affidavit Attachment A," which instructed the judge to "see addendum." (Gov. Ex. 3 at 3.) The affidavit incorporated the addendum and contained the bulk of the narrative facts that law enforcement officers sometimes place in an affidavit itself. In addition, the application package incorporated an "Informant's attachment" that explained "THE INFORMANT IS RELIABLE FOR THE FOLLOWING REASONS," including that the informant "[h]as otherwise demonstrated truthfulness." (*Id.* at 4.) There was also an "Endorsement of Search Warrant Application" that said, "A portion of the grounds for issuance of the search warrant is based upon a confidential informant who provided information to Del Valle." (*Id.* at 5.)

First, Defendant's argument that the CI is unreliable because he or she had only worked with Officer Del Valle for a month is unavailing. "When [an] affidavit is based on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search." *Solomon*, 432 F.3d at 827 (citing *United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996)); *United States v. Wilker*, No. 11-CR-109-LRR, 2011 WL 6258405, at *3 (N.D. Iowa Dec. 14, 2011). I find that five tips and one arrest in one month is some

50

evidence of a reliable CI. Although the proof is not extensive, I find it more likely than not that the "one arrest" referred to in the affidavit is a previous arrest. The "informant's Attachment" uses the past tense: "The informant's past information has led to the making of 1 arrest[]." (Gov. Ex. 3 at 4.) The common sense reading of this sentence is that this refers to a prior arrest as distinguished from the arrest related to the warrant being sought. One arrest satisfies me of the CI's value and competence over the course of one month.

Second, Officer Ehlers made it clear in the application that the CI provided information to Officer Del Valle and not to him. I do not find the fact that the CI communicated with Officer Del Valle instead of directly with Officer Ehlers troublesome. Officer Ehlers swore that he related the information from Officer Del Valle truthfully. In addition, "'probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation . . . if there is some degree of communication.'" *United States v. Edwards*, 891 F.3d 708, 711-12 (8th Cir. 2018) (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)). Here, there was telephone communication between Officers Del Valle and Ehlers both before Officer Ehlers arrived at the hotel and as he was completing his warrant applications. (Ehlers Hr'g Test.) They were both involved in the investigation of Defendant. Officer Del Valle first made Officer Ehlers aware that Defendant was involved in criminal activity on the night of October 10, 2018. Thus, I do not find that reliance on multiple officers undermined the judge's finding of probable cause. *See Edmiston*, 46 F.3d at 788.

Third, I find that the CI's tip was adequately corroborated. The CI said that Defendant was in a maroon 2004 Hyundai Santa Fe belonging to Sierra Patterson, that he had a sawed-off shotgun and a personal-use amount of methamphetamine, and that he was staying at the Isle of Capri Casino. Officers saw Defendant riding as a passenger in a maroon Santa Fe at approximately 5:00 p.m. and later corroborated that Sierra Patterson owned the maroon 2004 Hyundai Santa Fe parked at the hotel. Officers also

found a sawed-off shotgun in plain view in the vehicle. Once Officers spoke with Defendant and Ms. Patterson after *Mirandizing* them, officers were able to corroborate Defendant's use of methamphetamine because they found a glass pipe in his pocket while conducting a search incident to arrest of Defendant.[7] Ms. Patterson stated there was marijuana in room 808 and a scale in the vehicle, which corroborated that drugs were associated with the vehicle and Defendant. Ms. Patterson corroborated the presence of a sawed-off shotgun in her vehicle. Based on all this information, the warrant was sought "[i]n order to look for firearms, ammunition, firearm boxes, and spent firearm shell casings; Methamphetamine or any other illegal narcotics, any paraphernalia associated with the use of Methamphetamine or any other illegal narcotics." (Gov. Ex. 3 at 6.)

Fourth, I find that the warrant application established the truthfulness of the CI. One way to establish the truthfulness of a confidential informant is by finding corroboration. *United States v. Fulgham*, 143 F.3d 399, 401 (8th Cir. 1998) ("Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.") (citing *United States v. Williams,* 10 F.3d 590, 593 (8th Cir. 1993)); *United States v. Stevens*, No. 06-CR-139 LRR, 2007 WL 294285, at *4 (N.D. Iowa Jan. 25, 2007), *aff'd*, 530 F.3d 714 (8th Cir. 2008). Once a confidential informant's information is shown to be reliable because of independent corroboration, "then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Id.* (quoting *Williams,* 10 F.3d at 593-94) (citing *Illinois v. Gates,* 462 U.S. 213, 233-34 (1983)); *Draper v. United States,* 358 U.S. 307, 313 (1959)). In the case

---

[7] Although I recommended suppressing the pipe, above, I must first analyze whether substantial evidence supported issuance of the warrants based on the warrants as written, including evidence I may ultimately recommend suppressing.

at bar, the CI's information was corroborated both before and after officers entered the hotel. Officers saw Defendant in the vehicle described by the CI and saw the vehicle with the sawed-off shotgun parked at the location where the CI said Defendant was staying. Once officers spoke to Defendant and Ms. Patterson, they obtained further corroboration that Defendant possessed the gun, methamphetamine, and other drugs. Therefore, I find that the warrant demonstrated the CI's truthfulness.

Fifth, Defendant argues that the warrant application is missing any information "about [Officer] Ehlers's training and experience, or anything else that might reasonably support this inference," in spite of the fact that "it may be the case . . . firearms of the kind observed by Ehlers are frequently used in the drug trade." (Doc. 47-1 at 15.) I agree that such "pedigree" language is very often included in warrant applications. However, I find that the warrant application contained substantial evidence to support issuance of the warrant. Giving the application a common sense reading, it was logical to look for the .380 caliber handgun Defendant admitted would be in room 808, along with ammunition for both the handgun and the shotgun found in the vehicle. Ammunition is something logically associated with guns and can easily be secreted in luggage, clothing, or other personal items. Furthermore, to the extent Defendant takes issue with the application's request to search for "firearms" rather than certain firearms that Officer Ehlers knew already existed, I find that was not an unwarranted fishing expedition. Defendant was already associated with two guns, at least one of which was an illegal firearm. In addition, the warrant application states that Defendant had "a quantity" of methamphetamine. The pipe found in Defendant's pocket implicated Defendant as a methamphetamine user, but that was no basis to conclude that he had used all the methamphetamine the CI reported in Defendant's possession. The scale that Ms. Patterson admitted was in her car suggested that Defendant could be more than a mere user. The scale was a strong indication that someone associated with the vehicle may be

dealing drugs. Because no methamphetamine was found on Defendant and because drugs are easily transportable, it was logical to continue to look for methamphetamine in room 808. Finally, because Ms. Patterson told officers about the scale, Officer Ehlers was justified in believing that other illegal drugs or paraphernalia would likely be found in room 808.

In conclusion, I find that the totality of the circumstances indicated "a fair probability that evidence of a crime would be found" in room 808. *Kail*, 804 F.2d at 444. The warrant application as written provided substantial evidence from which the judge could conclude there was a nexus between illegal firearms, ammunition, drugs, and room 808. *See Tellez*, 217 F.3d at 550. Accordingly, substantial evidence supported issuance of the warrant.

Therefore, unless the warrant as written is deficient for some other reason, as established herein, I recommend that evidence seized in reliance on the warrant for the search of room 808 need not be suppressed.

### 2. Warrant for Defendant's Urine

The factual recitation of the affidavit in support of the application for the warrant for Defendant's urine is reproduced below.

[1.] On October 10th, 2018 officers received information from confidential source in reference a male identified as Adrian Zarate being in possession of a sawed off shotgun and a quantity of methamphetamine while in a maroon 2004 Hyundai Sante [sic] Fe belonging to his girlfriend Sierra Patterson within the past 7 hours.

[2.] On October 10th, 2018 at approximately 1700 hours Tri County Drug Task Force Investigator Diana Del Valle observed the maroon 2004 Hyundai Sante [sic] Fe traveling on Conger Street in Waterloo Iowa. Investigator Del Valle observed Adrian Zarate in the front passenger seat of the vehicle. The vehicle was bearing Iowa license plate HGX848. Investigator Del Valle then lost visual of the vehicle.

[3.] Iowa Department of Transportation records showed the registered owner of the vehicle to be Sierra Patterson, the defendant.

54

[4.] CS#1 advised that Zarate was staying at the Isle of Capri Casino.

[5.] Sergeant Robert Duncan located the maroon 2004 Hyundai Sante [sic] Fe bearing Iowa license plate HGX848 unoccupied in the parking lot of the Isle of Capri Casino.

[6.] Sergeant Duncan observed a sawed off single barrel shotgun in plain view next to the driver's seat inside the vehicle.

[7.] The vehicle was secured at this time.

[8.] Your affiant went into the Isle of Capri Casino and spoke with front desk staff who advised that Adrian Zarate was renting room 808. Your affiant called room 808 and spoke with a female and a male was identified himself as Adrian Zarate.

[ 9.] Your affiant and officers from the Waterloo Police Department went to room 808 and Zarate came to the door. Officers secured Zarate and a female who was identified as Sierra Patterson in order to conduct a search warrant on room 808.

[10.] Adrian Zarate had a glass pipe in his back pocket when he was detained. Your affiant read Zarate his Miranda Rights. Zarate stated that there was a .380 caliber handgun inside room 808.

[11.] Sierra Patterson was read her Miranda Rights and stated that there was a sawed off shotgun in her vehicle along with a scale.

[12.] Patterson stated that Zarate had been using drugs during the three months she had been dating him.

[13.] Zarate stated he uses the glass pipe to smoke "weed oils." Zarate stated he had brought marijuana into the room and stated he smokes marijuana.

[14.] Zarate also explained to officers that there is a .410 shotgun in the vehicle they had been driving. Zarate admitted to possessing both the .410 shotgun and the .380 handgun.

(Gov. Ex. 4 at 5.) Defendant argues that the affidavit in support of the warrant to obtain and test his urine must be redacted because the warrant was obtained using statements that are fruits of the poisonous tree. Defendant asserts probable cause is absent based on a redacted affidavit. (Doc 47-1 at 15-16.) In addition, Defendant argues that this warrant application package is missing the page discussing the CI's reliability, which undermines the tip upon which the searches are based. The Government did not respond to this argument.

55

Although information about a confidential informant's credibility is "crucial" when testing the sufficiency of affidavits for warrants, "'[i]n general, no one factor necessarily dooms a search warrant.'" *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015) (quoting *United States v. Glover*, 755 F.3d 811, 816 (7th Cir.2014)). "The United States Supreme Court has never squarely decided whether or not, when one of two contemporaneously filed affidavits is attacked, the evidence supplied by the other can be considered as support for the . . . finding of probable cause for the warrant under attack." *United States v. Nolan*, 413 F.2d 850, 853 (6th Cir. 1969) (holding that two affidavits could support probable cause for one warrant). However, a judge presented with multiple affidavits based on the same set of facts need not read any particular affidavit with "tunnel vision." *United States v. Fogarty*, 663 F.2d 928, 930 (9th Cir. 1981) (citing *United States v. Dudek*, 560 F.2d 1288, 1292-93 (6th Cir. 1977)). This type of common sense reading is in concert with the Supreme Court's command to avoid hypertechnical reading of warrant applications and is in concert with federal courts that have addressed the issue. *See id.*; *Nolan*, 413 F.3d at 853; *United States v. Abdul-Ganui*, No. 2:10CR16, 2010 WL 5279948, at *7 (W.D. Pa. Dec. 14, 2010) (finding probable cause based on two affidavits and discussing federal and state cases wherein multiple affidavits supported probable cause); *U. S. ex rel. Hurley v. Del.*, 365 F. Supp. 282, 287 n.9 (D. Del. 1973) (multiple affidavits submitted at one time supported probable cause to issue one specific warrant); *United States v. Averell*, 296 F. Supp. 1004, 1016 (E.D.N.Y. 1969) ("[A] search warrant may be based on interrelated affidavits . . . even if earlier submitted. . .") (citing *United States v. Serao*, 367 F.2d 347 (2d Cir. 1966), *vacated on other grounds*, 390 U.S. 202 (1967)). *See also United States v. Barker*, No. 14-CR-32-DCR-REW, 2014 WL 2561989, at *9 n.8 (E.D. Ky. June 2, 2014) (gathering cases holding probable cause can be supported by multiple affidavits and holding that although it was not necessary to consider multiple affidavits in conducting its *Leon* good-

56

faith review, information contained in second affidavit "strengthen[ed] the probable cause determination"), *R. & R. adopted*, 2014 WL 2742793 (E.D. Ky. June 6, 2014), *aff'd*, 611 F. App'x 346 (6th Cir. 2015).

In the case at bar, Judge Staudt had three affidavits in front of him all based on the same set of facts and all supported by information provided by the same CI. I find that a reasonable judge examining this set of documents in a common sense way would have considered the information about the CI's reliability from the room 808 warrant application and the vehicle warrant application in determining whether the informant was reliable in connection with the warrant application for Defendant's urine. To require the judge to ignore that information would be to require the judge to read with tunnel vision in a hypertechnical fashion that is contrary to law and common sense. *Gates*, 462 U.S. at 236. Therefore, I find that the results of Defendant's urine test need not be suppressed on this basis.

Moreover, I find that the warrant application as written provided a substantial basis from which to conclude Defendant's urine specimen would contain evidence of illegal drug use. *See Edmiston*, 46 F.3d at 788. Defendant admitted to using marijuana and said he had marijuana in room 808 on October 11, 2018. When detained, Defendant had a glass pipe in his pocket and stated he used it to smoke "weed oils." The CI also said that Defendant possessed methamphetamine. In addition, Ms. Patterson stated that there was a scale in her vehicle, which is something commonly associated with the drug trade.

Accordingly, I find that the totality of the circumstances pointed to "a fair probability" that evidence of a crime would be found in Defendant's urine. *Kail*, 804 F.2d at 444. The circumstances documented in the warrant application as written documented a nexus between illegal drugs and Defendant's urine. *Tellez*, 217 F.3d at 550. Thus, I find that substantial evidence supported issuance of the warrant.

Therefore, unless the warrant as written is deficient for some other reason, I recommend that evidence seized in reliance on the warrant for the search of Defendant's urine need not be suppressed.

### 3. *Leon Good Faith Exception*

The Government argues that even if the court finds the two warrants lacked probable cause, the *United States v. Leon* good faith exception applies to both warrants. Defendant responds that the *Leon* good faith exception does not apply because the warrant applications are based upon evidence obtained as a result of constitutional violations. Specifically, Defendant argues the following:

> Ehlers sought all three warrants and seems to have executed both the car and room warrants. These warrants were preceded by clear illegality—the unlawful search of the room and seizure of its occupants—and Ehlers knew it. As to the warrant for Mr. Zarate's urine, it was preceded by the same illegality, and supported almost entirely by clearly unmirandized [sic] in-custody statement, which were themselves fruits of the plainly illegal seizure. . . . [A]ll of [Mr. Zarate's] statements were made in response to custodial interrogation, and thus, *presumptively* involuntary. The government makes much of the fact that Defendant has not claimed his statements were involuntary; however, all statements made in response to unwarned custodial interrogation are presumed involuntary. *Oregon v. Elmstad*, 470 U.S. 298, 306-07 (1985).

(Doc. 62 at 3-4, 4 n.2.)

Under the *Leon* good faith exception, even if a reviewing court determines substantial evidence to issue a warrant was absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate. 468 U.S. at 922; *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). However, "[i]f the method by which evidence supporting a search warrant is seized is clearly illegal, then even under *Leon* . . . evidence obtained under the resulting

warrant should be excluded." *United States v. O'Neil*, 17 F.3d 239, 242 n.6 (8th Cir. 1994). To not exclude this evidence would be to undermine one of the purposes of the exclusionary rule, which is to deter police misconduct. *Id.* (citing *Leon*, 468 U.S. at 918); *Conner*, 127 F.3d at 667 (affirming district court's decision to suppress evidence because "no officer could in good faith believe, under the facts as they existed at the time, that the defendants consented to the officers' visual or physical access to the motel room.") (quoting *Conner*, 948 F. Supp. at 853). *See also United States v. Long*, 797 F.3d 558, 571 (8th Cir. 2015) (refusing to apply *Leon* good faith exception to warrant search of closed business).

In the case at bar, I have already determined that some of the evidence supporting the warrants was obtained by illegal methods. *See O'Neil*, 17 F.3d at 242 n.6. The illegalities began when officers gained entry to room 808. *See supra* Part III.B.2. The illegalities continued when officers conducted the warrantless search of room 808 and illegally seized Defendant. *See supra* Parts III.B.1,2.

Officer Ehlers applied for the warrants. The warrants as written contain statements made by Defendant and Ms. Patterson at the hotel. I found that the statements Defendant made in the hallway of the hotel were obtained in violation of Defendant's *Miranda* rights because Defendant did not knowingly, intelligently, and voluntarily waive those rights and statements made at the hotel were not attenuated from that constitutional violation. *Contra Reisselman*, 646 F.3d at 1080-81. Ms. Patterson's statements were made in violation of Defendant's Fourth Amendment rights because the search of room 808 was the but-for cause of her statements and the statements were not attenuated from that constitutional violation.

This case is analogous to *Conner*, in which the court suppressed evidence seized and statements made by defendants after defendants opened their motel room door in response to officers repeatedly banging on the door and demanding they open the door

for the police. 948 F. Supp. at 827. The officers were acting in response to an anonymous tip that defendants possessed contraband from a burglary in a hotel room somewhere in the city. *Id.* at 826. The tipster also said the defendants were driving a car identified by its license plate. *Id.* Officers had located the car parked outside of the motel room. *Id.* Once inside the room, officers saw the contraband in plain view and obtained search warrants based on the tip and what they had observed in the room. *Id.* at 827-28. After finding that no exigent circumstances justified the officers' entrance into the motel room and seizure of the defendants, the court next addressed the *Leon* good faith exception and held that "[n]o officer could in good faith believe, under the facts as they existed at the time, that the defendants consented to the officers' visual or physical access to their motel room." *Id.* at 853. Thus, the court found that the *Leon* good faith exception did not apply because "[o]btaining a search warrant could not sanitize the officers' prior misconduct." *Id.* at 854. The Eighth Circuit affirmed. *Conner*, 127 F.3d 663.

As in *Conner*, under the facts that existed at the time, no reasonable officer could believe that Defendant consented to access to room 808 because he opened the door to "hotel front desk." In so doing, he consented to engage with hotel staff, not police officers. Officer Ehlers and the other officers at the hotel that night knew that, which is why they had someone from the hotel staff help them in their ruse. Just as in *Conner*, obtaining search warrants did not sanitize this initial constitutional violation. Therefore, "even under *Leon* . . . evidence obtained under the resulting warrant[s] should be excluded." *O'Neil*, 17 F.3d at 242 n.6. The *Leon* good faith exception does not apply to the warrants.

### 4. *Conclusion on Warrants as Written*

Based on the above discussions, if neither of the warrants is deficient because it contained information that was fruit of the poisonous tree, no items seized during searches

60

conducted pursuant to the warrants should be suppressed. Substantial evidence supported issuance of the warrants as written. If, in reviewing my report, the Court finds the warrants as written are deficient, I recommend the Court find the *Leon* good faith exception does not apply because they are based on unconstitutionally obtained evidence.

**5.      *Independent Source Doctrine***

Evidence acquired through a source independent of the taint of a constitutional violation is admissible. *Wong Sun*, 371 U.S. at 487.

> A warrant obtained after an illegal search is not an independent source if either of the following are true: if the agents' decision to seek the warrant was prompted by what they had seen during the [unconstitutional] entry, and if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Swope*, 542 F.3d at 613 (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)). In other words, two questions "must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." *Id.* at 613-14. If removing the tainted information from the warrant removes the basis for probable cause, anything seized in the search based on the warrant must be suppressed. However, if the warrant with the information redacted still contains probable cause, any search based on the warrant was valid, barring other constitutional violations or deficiencies. *Id.* at 616-17 (finding application supported probable cause when reading the untainted portions of the warrant at issue). I have already found that the evidence Defendant seeks to omit from the warrants is fruit of the poisonous tree and therefore should be redacted from the warrants. Specifically, I find that the statements Defendant made in the hallway, the statements Ms. Patterson made in room 808, and the pipe found in the search incident to arrest of Defendant should be redacted from the warrants.

### a.    Warrant for Hotel Room

I find that Officer Ehlers would have applied for the warrant for room 808 had he not acquired any tainted information.  He testified that he decided to seek a warrant for the hotel room and the vehicle as soon as he saw the sawed-off shotgun in the parking lot of the hotel.  (Ehlers Hr'g Test.)

Defendant asserts that paragraphs 9 through 11 must be redacted as fruits of the poisonous tree.  For the most part, I agree.  The paragraphs of the warrants as written are reproduced below followed by the reasons they should be redacted:

> [ 9.]    Your affiant and officers from the Waterloo Police Department went to room 808 and Zarate came to the door. Officers secured Zarate and a female who was identified as Sierra Patterson in order to conduct a search warrant on room 808.

The first sentence of Paragraph 9 need not be redacted.  This sentence merely describes events that led to encountering Defendant. The second sentence must be redacted because it contains statements that are fruits of the poisonous tree.  As discussed above, officers secured Defendant and Ms. Patterson only because officers initially violated Defendant's and Ms. Patterson's Fourth Amendment rights by entering room 808 by ruse and then conducting a warrantless search of the room and unconstitutionally seizing Defendant.  *See Duncan*, 869 F.2d at 1102 (holding that opening a door in response to a ruse is not voluntarily opening the door).  For this reason, all but the first sentence of paragraph 9 should be redacted.

> [10.]    Adrian Zarate had a glass pipe in his back pocket when he was detained. Your affiant read Zarate his Miranda Rights. Zarate stated that there was a .380 caliber handgun inside room 808.

Paragraph 10 should be redacted as the product of the illegal seizure of Defendant and search of room 808.  As discussed above, the discussion of the pipe should be redacted because it was discovered in a search incident to arrest.  The arrest was based

62

on the initial unconstitutional seizure of Defendant. Therefore, the pipe is the fruit of the poisonous tree.

Defendant's statement about the handgun should be redacted as fruit of the poisonous tree. The only reason Defendant said anything to Officer Ehlers was that he was subject to questioning in the hallway after his unconstitutional seizure. Moreover, as discussed above, the *Miranda* warning did not purge the taint of the constitutional violation because Defendant did not give a knowing, intelligent, and voluntary waiver of his right to remain silent. For these reasons, paragraph 10 should be redacted.

> [11.]  Sierra Patterson was read her Miranda Rights and stated that there was a sawed off shotgun in her vehicle along with a scale. Patterson said there was marijuana inside the room.

Ms. Patterson's statements should be redacted as fruit of the poisonous tree because her statements were made as a result of the illegal search of the hotel room in violation of Defendant's Fourth Amendment rights. *See Duncan*, 869 F.2d at 1102. As discussed above, the *Miranda* warning did not purge the taint of the constitutional violation, and therefore, paragraph 11 should be redacted.

Without the poisonous content of paragraphs 9-11, Defendant avers that the warrant does not support probable cause that contraband would be found in room 808. The factual recitation of the affidavit in support of the application for the warrant to search room 808 with paragraphs 9 through 11 redacted, with the exception of the first sentence of paragraph 9, is reproduced below.

> [1.]  On October 10th, 2018 officers received information from confidential source in reference a male identified as Adrian Zarate being in possession of a sawed off shotgun and a quantity of methamphetamine while in a maroon 2004 Hyundai Sante [sic] Fe belonging to his girlfriend Sierra Patterson within the past 7 hours.
> [2.]  On October 10th, 2018 at approximately 1700 hours Tri County Drug Task Force Investigator Diana Del Valle observed the maroon 2004 Hyundai Sante [sic] Fe traveling on Conger Street in Waterloo

Iowa. Investigator Del Valle observed Adrian Zarate in the front passenger seat of the vehicle. The vehicle was bearing Iowa license plate HGX848. Investigator Del Valle then lost visual of the vehicle.

[3.] Iowa Department of Transportation records showed the registered owner of the vehicle to be Sierra Patterson, the defendant.

[4.] CS#1 advised that Zarate was staying at the Isle of Capri Casino.

[5.] Sergeant Robert Duncan located the maroon 2004 Hyundai Sante [sic] Fe bearing Iowa license plate HGX848 unoccupied in the parking lot of the Isle of Capri Casino.

[6.] Sergeant Duncan observed a sawed off single barrel shotgun in plain view next to the driver's seat inside the vehicle.

[7.] The vehicle was secured at this time.

[8.] Your affiant went into the Isle of Capri Casino and spoke with front desk staff who advised that Adrian Zarate was renting room 808. Your affiant called room 808 and spoke with a female and a male was identified himself as Adrian Zarate.

[ 9.] Your affiant and officers from the Waterloo Police Department went to room 808 and Zarate came to the door.

. . .

[12.] Your affiant respectfully asks the Court to grant a search warrant for . . . room 808 [i]n order to look for firearms, ammunition, firearm boxes, and spent firearm shell casings; Methamphetamine or any other illegal narcotics, any paraphernalia associated with the use of Methamphetamine or any other illegal narcotics.

I find that the facts in the warrant as redacted still provide substantial evidence to support issuance of the warrant to search room 808. As previously discussed, the CI's information was corroborated and ammunition and small quantities of drugs can easily be carried into hotel rooms. Defendant was seen in the car that contained the gun where Defendant was reported to possess methamphetamine. The car and gun were located in the parking lot of the Isle of Capri Hotel and Defendant was in room 808 of the hotel. That information supplied the necessary nexus between the contraband and the place to be searched. *See Tellez*, 217 F.3d at 550. Therefore, I find that the redacted warrant

provided substantial evidence to issue the search warrant for room 808 and evidence seized during the search of room 808 need not be suppressed.

> **b.** *Warrant for Defendant's Urine*

I find that Officer Ehlers would have applied for the warrant for Defendant's urine had he not acquired any tainted information. He testified that he decided to seek a warrant for Defendant's urine as soon as he saw the sawed-off shotgun in the vehicle. (Ehlers Hr'g Test.)

Defendant asserts that paragraphs 9 through 13 must be redacted as fruits of the poisonous tree. For the most part, I agree. The paragraphs of the warrants as written are reproduced below followed by the reasons they should be redacted:

> [ 9.] Your affiant and officers from the Waterloo Police Department went to room 808 and Zarate came to the door. Officers secured Zarate and a female who was identified as Sierra Patterson in order to conduct a search warrant on room 808.
>
> [10.] Adrian Zarate had a glass pipe in his back pocket when he was detained. Your affiant read Zarate his Miranda Rights. Zarate stated that there was a .380 caliber handgun inside room 808.
>
> [11.] Sierra Patterson was read her Miranda Rights and stated that there was a sawed off shotgun in her vehicle along with a scale.

Paragraphs 9-11 are almost identical to paragraphs 9-11 of the warrant to search room 808. The only difference is that paragraph 11 of the warrant to search room 808 contains an extra sentence: "Patterson said there was marijuana inside the room." For the reasons stated above, I find that all but the first sentence of paragraph 9 should be redacted as fruit of the poisonous tree.

> [12.] Patterson stated that Zarate had been using drugs during the three months she had been dating him.

As discussed above, Ms. Patterson's statements should be redacted as fruit of the poisonous tree because her statements were made as a result of the illegal search of the

hotel room in violation of Defendant's Fourth Amendment rights. *See Duncan*, 869 F.2d at 1102. The *Miranda* warning did not purge the taint of the constitutional violation, and therefore, paragraph 12 should be redacted.

> [13.] Zarate stated he uses the glass pipe to smoke "weed oils." Zarate stated he had brought marijuana into the room and stated he smokes marijuana.

Paragraph 13 should be redacted as fruit of the poisonous tree. The only reason Defendant said anything to Officer Ehlers was that he was subject to questioning in the hotel hallway after the unconstitutional seizure of Defendant. Moreover, as discussed above, the *Miranda* warning did not purge the taint of the constitutional violation. For these reasons, paragraph 13 should be redacted.

Without those paragraphs, Defendant avers that the warrant does not support probable cause. The redacted factual recitation of the affidavit in support of the application for the warrant for Defendant's urine is reproduced below.

> [1.] On October 10th, 2018 officers received information from confidential source in reference a male identified as Adrian Zarate being in possession of a sawed off shotgun and a quantity of methamphetamine while in a maroon 2004 Hyundai Sante [sic] Fe belonging to his girlfriend Sierra Patterson within the past 7 hours.
>
> [2.] On October 10th, 2018 at approximately 1700 hours Tri County Drug Task Force Investigator Diana Del Valle observed the maroon 2004 Hyundai Sante [sic] Fe traveling on Conger Street in Waterloo Iowa. Investigator Del Valle observed Adrian Zarate in the front passenger seat of the vehicle. The vehicle was bearing Iowa license plate HGX848. Investigator Del Valle then lost visual of the vehicle.
>
> [3.] Iowa Department of Transportation records showed the registered owner of the vehicle to be Sierra Patterson, the defendant.
>
> [4.] CS#1 advised that Zarate was staying at the Isle of Capri Casino.
>
> [5.] Sergeant Robert Duncan located the maroon 2004 Hyundai Sante [sic] Fe bearing Iowa license plate HGX848 unoccupied in the parking lot of the Isle of Capri Casino.

[6.]      Sergeant Duncan observed a sawed off single barrel shotgun in plain view next to the driver's seat inside the vehicle.

[7.]      The vehicle was secured at this time.

[8.]      Your affaint went into the Isle of Capri Casino and spoke with front desk staff who advised that Adrian Zarate was renting room 808. Your affiant called room 808 and spoke with a female and a male was identified himself as Adrian Zarate.

[ 9.]      Your affiant and officers from the Waterloo Police Department went to room 808 and Zarate came to the door.

I find that the facts in the warrant as redacted still provide substantial evidence to support issuance of the warrant for Defendant's urine. The redacted narrative provides a nexus linking Defendant to drug usage because the CI stated that Defendant was in possession of an illegal firearm and methamphetamine. *See Tellez*, 217 F.3d at 550. Along with the corroboration of the CI's tip, these two facts, together, lead to the logical inference that Defendant could be a drug user in possession of a firearm. *See Wallace*, 550 F.3d at 732. Therefore, I find that the redacted warrant contained "a fair probability" that evidence of a crime would be found in Defendant's urine. *Kail*, 804 F.2d at 444. Because the facts in the redacted warrant provide substantial evidence to support issuance of the warrant, evidence seized during the search of Defendant's urine need not be suppressed.

## *IV. CONCLUSION*

For the reasons set forth above, I respectfully recommend the District Court **Grant in Part and Deny in Part** Defendant's Motion to Suppress Evidence. **(Doc. No. 47.)**

I recommend the motion be **GRANTED** as to the following evidence:

(1)      Statements Defendant made in the hallway of the Isle Capri Hotel;

(2)      The pipe seized from the search incident to the arrest of Defendant; and

(3)      Statements Ms. Patterson made at the Isle of Capri Hotel.

I recommend the motion be **DENIED** as to the following evidence:

(1)      Statements Defendant made at the Waterloo Police Station;

67

(2)    Evidence seized in the search conducted pursuant to the search warrant for room 808 of the Isle of Capri Hotel; and

(3)    Evidence seized in the search conducted pursuant to the search warrant for Defendant's urine.


Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 3rd day of July, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

68