# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 18-CR-2073-CJW-MAR |
| vs. | **MEMORANDUM OPINION** |
| ADRIAN ALEXANDER ZARATE, | **AND ORDER** |
| Defendant. | |

---

## I.    INTRODUCTION

This matter is before the Court on the government's Objections (Doc. 79) and defendant's Objections (Doc. 80) to the Report and Recommendation (Doc. 76) of the Honorable Mark A. Roberts, United States Magistrate Judge, in which Judge Roberts recommends that the Court grant in part and deny in part defendant's motion to suppress evidence (Doc. 47).  On March 1, 2019, defendant filed a Motion to Suppress.  (*Id.*).  On March 8, 2019, the government timely filed a resistance.  (Doc. 55).  On March 12, 2019, defendant filed a reply brief.  (Doc. 62).  On March 22, 2019, Judge Roberts held a hearing on the motion.  (*See* Doc. 63).  On July 3, 2019, Judge Roberts issued the Report and Recommendation.  (Doc. 76).  On July 17, 2019, defendant and the government timely filed their respective Objections.

For the following reasons, the government's objections (Doc. 79) are **overruled**, defendant's objections (Doc. 80) are **overruled in part and sustained in part**, the Report and Recommendation (Doc. 76) is **adopted in part and modified in part**, and defendant's motion to suppress (Doc. 47) is **granted in part and denied in part**.

## II.  STANDARDS OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[ ] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report and recommendation when such review is required. *Lothridge*, 324 F.3d at 600.

When no party objects to a magistrate judge's report and recommendation, or when a party objects to only certain portions of a report and recommendation, the district judge is required to review the unobjected-to portions of the report and recommendation for clear error. *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *United States v. Riesselman*, 708 F. Supp. 2d 797, 807-08 (N.D. Iowa 2010). When the Eighth Circuit Court of Appeals reviews a motion to suppress for clear error, the Eighth Circuit will "affirm the district court's decision . . . unless it is not supported by substantial evidence on the record; it reflects an erroneous view of the applicable law; or upon review of the entire record, [the Eighth Circuit Court of Appeals is] left with the definite and firm

conviction that a mistake has been made." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (citation and internal quotation marks omitted).

This Court, similarly, has explained that "[a]lthough the Eighth Circuit Court of Appeals has not explained precisely what 'clear error' review means in this context, in other contexts, the Supreme Court has stated that the 'foremost' principle under this standard of review 'is that a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Powell v. Fayram*, 778 F. Supp. 2d 952, 962 (N.D. Iowa 2011) (internal quotation marks and alteration omitted) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564 573-74 (1985)). Even though Title 28, United States Code, Section 636 "does not require the [district] judge to review an issue de novo if no objections are filed, [the statute] does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a de novo or any other standard." *Thomas v. Arn*, 474 U.S. 140, 154 (1986).

In accordance with these standards, the Court reviews the disputed portions of the Report and Recommendation de novo. The Court has also undertaken to review the facts of this case de novo, and the Court's findings are reflected in the following section. As to those portions of the Report and Recommendation that are neither factual findings nor objected to, the Court has conducted a review under the clearly erroneous standard, and the Court has found no clear error.

## III. FACTS[1]

On October 10, 2018, a Waterloo Police Department Investigator received a tip from a confidential informant ("CI") that defendant was "in possession of methamphetamine and a sawed-off shotgun," and that "he was also armed with multiple blades, machetes, ax, and also that he was heavily under the influence of methamphetamine and acting crazy." (Doc. 77, at 6-7). The CI stated that defendant was "staying at the Isle of Capri Casino . . . with his girlfriend, Sierra Patterson." (*Id.*, at 8). The Investigator had seen both defendant and his girlfriend earlier that day in a red or maroon Hyundai sports utility vehicle ("SUV"). (*Id.*, at 8-9, 41). A short time later, Police Sergeant Robert Duncan saw the unoccupied SUV parked in the Casino's parking lot. (*Id.*, at 9-10). Officer Jordan Ehlers went to the Casino where he and Officer Duncan looked into the SUV. (*Id.*, at 11, 75). They saw a sawed-off shotgun on the floor of the SUV in plain view. (*Id.*, at 11-12, 75).

Officers then spoke with Casino staff and learned that defendant was staying in room 808, which was located on the eighth floor. (*Id.*, at 13). Officer Ehlers called room 808, pretending to be a hotel employee, and discovered that defendant and a woman were in the room. (*Id.*, at 14-15). Officer Ehlers asked defendant to come to the front desk to "update his information for the room," and defendant agreed to do so. (*Id.*, 16). Instead of waiting, however, the officers went to the hallway outside room 808 and waited ten to fifteen minutes. (*Id.*, at 16-17). When defendant did not come out of the room, the officers had a hotel employee knock on the door while the officers stood outside the occupants' view. (*Id.*, at 17, 19). After the employee knocked on the door to room 808

---

[1] After reviewing the Hearing Transcript (Doc. 77) and other evidence of record de novo, the Court finds that, except when noted, Judge Roberts accurately and thoroughly set forth the relevant facts in the Report and Recommendation. The Court will, therefore, only briefly summarize the facts here, as they relate to the parties' objections. When relevant, the Court relies on and discusses additional facts in conjunction with its legal analysis.

three times, announcing "Hotel front desk," defendant finally opened the door. (Exhibit 8).[2]

Sergeant Duncan entered the room with a handgun drawn and told defendant and Patterson to put their hands up. (Exhibit 11). As defendant stood in the room near the doorway with his hands raised, Officer Ehlers grabbed defendant's left hand and pulled defendant out of the room and into the hallway and directed him to the floor. (Exhibits 8 & 11). Officer Ehlers then handcuffed defendant, told defendant he was being detained, and patted him down for weapons; none were found. (Exhibit 8). Officer Ehlers, from memory, then advised defendant of his constitutional rights as follows:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to talk to an attorney and have one present with you when you're being questioned. If you cannot afford to hire an attorney, one will be appointed to represent you, if you wish. Do you understand these rights I have read to you?

(Exhibit 8). In his report, Officer Ehlers wrote that defendant "stated he understood" his rights. (Exhibit 1, at 1). At the suppression hearing, Officer Ehlers testified that defendant "nodded his head yes" in response to the question of whether he understood his rights. (Doc. 77, at 28). Defendant made no audible response and his face is not visible on the video. (*Id.*, at 29; Exhibit 8). After a pause, Officer Ehlers began questioning defendant, who ultimately made incriminating statements about what was in the room.

Before Officer Ehlers had defendant taken to the police station, Officer Ehlers conducted another pat-down search. (*Id.*, at 31). This time, Officer Ehlers discovered a methamphetamine pipe in defendant's pocket. (*Id.*, at 31, 34-35). At the police station, Officer Lucas Scarbrough again questioned defendant; defendant again made

---

[2] Officers were wearing body cameras, the recordings of which were marked as Exhibits 8 and 11.

incriminating statements.  (*Id.*, at 37-39; Exhibit 10).  Officers did not provide defendant with another *Miranda* warning before questioning him at the police station.  (Doc. 77, at 39, 55).

Meanwhile, back at the Casino, Sergeant Duncan spoke with defendant's girlfriend in room 808.  She told Sergeant Duncan that there was a handgun and marijuana in the room, as well as a shotgun in her car.  (Exhibits 8 & 11).  Defendant's girlfriend also told Sergeant Duncan about defendant's drug use.  (Exhibits 8 & 11).

Officers then applied for three search warrants: one for the SUV, another for room 808, and a third for defendant's urine.  (Exhibits 2 through 4).  The affidavit in support of the search warrant for the hotel room made the following factual assertions:

[1.]  On October 10th, 2018[,] officers received information from confidential source in reference a male identified as Adrian Zarate being in possession of a sawed[-]off shotgun and a quantity of methamphetamine while in a maroon 2004 Hyundai Sante [sic] Fe belonging to his girlfriend Sierra Patterson within the past 7 hours.

[2.]  On October 10th, 2018[,] at approximately 1700 hours Tri County Drug Task Force Investigator Diana Del Valle observed the maroon 2004 Hyundai Sante [sic] Fe traveling on Conger Street in Waterloo Iowa.  Investigator Del Valle observed Adrian Zarate in the front passenger seat of the vehicle.  The vehicle was bearing Iowa license plate HGX848.  Investigator Del Valle then lost visual of the vehicle.

[3.]  Iowa Department of Transportation records showed the registered owner of the vehicle to be Sierra Patterson, the defendant.

[4.]  CS#1 advised that Zarate was staying at the Isle of Capri Casino.

[5.]  Sergeant Robert Duncan located the maroon 2004 Hyundai Sante [sic] Fe bearing Iowa license plate HGX848 unoccupied in the parking lot of the Isle of Capri Casino.

[6.]  Sergeant Duncan observed a sawed[-]off single barrel shotgun in plain view next to the driver's seat inside the vehicle.

[7.]  The vehicle was secured at this time.

[8.]  Your [affiant] went into the Isle of Capri Casino and spoke with front desk staff who advised that Adrian Zarate was renting room 808.  Your affiant called room 808 and spoke with a female and a male was identified himself as Adrian Zarate.

[9.] Your affiant and officers from the Waterloo Police Department went to room 808 and Zarate came to the door. Officers secured Zarate and a female who was identified as Sierra Patterson in order to conduct a search warrant on room 808.

[10.] Adrian Zarate had a glass pipe in his back pocket when he was detained. Your affiant read Zarate his *Miranda* Rights. Zarate stated that there was a .380 caliber handgun inside room 808.

[11.] Sierra Patterson was read her *Miranda* Rights and stated that there was a sawed[-]off shotgun in her vehicle along with a scale. Patterson said there was marijuana inside the room.

(Doc. 55-3, at 6 (Exhibit 3)).[3] The affidavit in support of the search warrant for defendant's urine was identical except that it added three more paragraphs:

[12.] Patterson stated that Zarate had been using drugs during the three months she had been dating him.

[13.] Zarate stated he uses the glass pipe to smoke "weed oils." Zarate stated he had brought marijuana into the room and stated he smokes marijuana.

[14.] Zarate also explained to officers that there is a .410 shotgun in the vehicle they had been driving. Zarate admitted to possessing both the .410 shotgun and the .380 handgun.

(Doc. 55-4, at 5 (Exhibit 4)).

## IV.    ANALYSIS

### A.    Background

In the motion to suppress, defendant argues that the officers' warrantless entry into the hotel room and seizure of defendant was unconstitutional and unjustified under the exigent circumstances exception. (Doc. 47-1, at 5-7). Defendant further reasons that the fruits of the search and seizure, including evidence from the room and statements made by defendant and Patterson, must be suppressed. (*Id.*, at 7-9). Defendant also

---

[3] Judge Roberts very helpfully numbered the paragraphs in the affidavit for ease of reference. I have done so as well.

argues that the *Miranda* warning provided to him was inadequate, requiring suppression of all of defendant's statements. (*Id.*, at 9-12). Defendant argues that the warrants to search the hotel room and his urine, when stripped of evidence unlawfully seized, lacked probable cause. (*Id.*, at 12-16).

In the Report and Recommendation, Judge Roberts found that, although officers had probable cause to enter room 808 to arrest defendant for possession of a sawed-off shotgun, the officers needed a warrant to do so, and exigent circumstances did not justify their warrantless entry into the hotel room under a ruse. (Doc. 76, at 11-24). Judge Roberts further found that, although the *Miranda* warning given to defendant was adequate, defendant did not voluntarily waive his *Miranda* rights under the circumstances. (*Id.*, at 30). Consequently, Judge Roberts concluded that defendant's statements made in the hallway should be suppressed (*id.*, at 34-35), but found that statements at the police station were sufficiently attenuated that they should be admissible (*Id.*, at 41). Judge Roberts also recommended suppression of statements made by defendant's girlfriend as fruit of the unlawful entry into the hotel room. (*Id.*, at 41-46).

In his motion to suppress, defendant does not challenge the legality of the search warrant for the SUV. As for the search warrants for the hotel room and defendant's urine, Judge Roberts found that probable cause supported the warrants, as written. (*Id.*, at 46-58). On the other hand, Judge Roberts recommended that if the Court finds the warrants, as written, were deficient to establish probable cause, then the *Leon* good faith exception to the exclusionary rule should not apply because he found the prewarrant conduct so clearly unconstitutional that officers could not rely in good faith on the evidence the warrants generated. (*Id.*, at 58-61). Applying the independent source doctrine, however, Judge Roberts found that the warrants were still supported by probable cause even when stripped of evidence he found should be suppressed

(defendant's statements made in the hallway, defendant's girlfriend's statements, and the methamphetamine pipe found on defendant). (*Id.*, at 61-67).

In sum, then, Judge Roberts recommended granting defendant's motion in part and suppressing:

(1) statements defendant made in the Casino hallway;

(2) the methamphetamine pipe seized from defendant; and

(3) statements defendant's girlfriend made in the Casino hallway.

(*Id.*, at 67). Judge Roberts recommended denying defendant's motion to suppress as to all other evidence. (*Id.*, at 67-68).

The government objects only to Judge Roberts' conclusion that the *Leon* good faith exception should not apply to save the search warrants for the hotel room and defendant's urine, if probable cause is found lacking. (Doc. 79). Defendant lodges four objections to Judge Roberts' Report and Recommendation. Defendant argues that Judge Roberts erred in (1) finding the *Miranda* warning was sufficient; (2) holding that defendant's statements at the police station were admissible; (3) finding that defendant's statements at the police station were made after a valid *Miranda* warning; and (4) concluding that the redacted warrant for defendant's urine established probable cause. (Doc. 80).

The Court will address each objection in turn.

### B.    *Government's Objection*

The government argues that Judge Roberts erred in finding that the *Leon* good faith exception to the exclusionary rule should not apply, if the Court finds that the warrants for the hotel and defendant's urine lacked probable cause. (Doc. 79). The government first notes that Judge Roberts concluded that the affidavits in support of the search warrants, even redacted of information obtained in violation of defendant's constitutional rights, would still have established probable cause to search the hotel room. (*Id.*, at 3). The government reasons, then, that it follows that the officers acted in good

faith reliance on the magistrate judge's issuance of the search warrants. (*Id.*). In other words, the government argues that the officers' "actions" were "close enough to the line of validity" to make the officers' belief in the legality of their conduct sufficient to be covered by the *Leon* good faith exception. (*Id.* (quoting *United States v. Fletcher*, 91 F.3d 48, 50 (8th Cir. 1996), and *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989))).

When a search warrant is not supported by probable cause, the evidence obtained during the search is generally inadmissible, but an exception exists for evidence obtained by officers relying "in objective good faith on a search warrant." *United States v. Koons*, 300 F.3d 985, 990-91 (8th Cir. 2002) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). In *Leon*, the Supreme Court "created the good-faith exception to the exclusionary rule." *United States v. Johnson*, 78 F.3d 1258, 1261 (8th Cir.1996) (citing *Leon*, 468 U.S. at 922). In explaining the need to create a good faith exception to the exclusionary rule (itself a judicial creation), the Supreme Court reasoned that:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. [O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

*Leon*, 468 U.S. at 921 (alteration in original) (footnote and internal citation and quotation marks omitted).

Under *Leon*'s good-faith exception, the Fourth Amendment exclusionary rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in

the issuance of a search warrant that is ultimately found to be invalid." *United States v. Taylor*, 119 F.2d 625, 629 (8th Cir. 1997) (citing *Leon*, 468 U.S. at 905, 922-23). "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916.

Courts have applied the *Leon* good faith exception when, as here, the search warrant application cites information gathered in violation of the Fourth Amendment. *See, e.g.*, *United States v. Kiser*, 948 F.2d 418, 421-22 (8th Cir. 1991) (finding that the *Leon* good faith exception applied to the search warrant even if the officers lacked reasonable articulable suspicion to detain defendant long enough to conduct a dog sniff); *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) ("[E]vidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid."). For the *Leon* exception to apply when a warrant is based on evidence obtained through a Fourth Amendment violation, the officers' prewarrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (quoting *White*, 890 F.2d at 1419). If "the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." *Id.* (quoting *United States v. O'Neal*, 17 F.3d 239, 242-43 n.6 (8th Cir. 1994)).

In its objection to Judge Roberts' Report and Recommendation, the government's focus is misplaced. The government focuses on Judge Roberts' conclusion that the warrants, stripped of the unconstitutionally-seized evidence, "were at least close enough to the line of validity" that "the warrants were supported by probable cause." (Doc. 79, at 3). Under the *Leon* analysis, however, the focus is properly on whether the officers' prewarrant conduct is close enough to the line of validity to justify a good faith belief that what they were doing was lawful.

Judge Roberts, in conducting his *Leon* analysis, properly focused on the officers' prewarrant conduct. (Doc. 76, at 59-60). Judge Roberts found the facts here analogous to those in *Conner*. In *United States v. Conner*, 948 F. Supp. 821, 851-54 (N.D. Iowa 1996), this Court found the *Leon* good faith exception inapplicable when the manner in which the officers entered a hotel room was so clearly illegal that they could not have relied on the validity of the subsequent warrant in good faith. As Judge Roberts noted, the Eighth Circuit Court of Appeals affirmed this Court's *Conner* decision. *Conner*, 127 F.3d at 663.

Although I believe it is a close question, in conducting my own de novo review, I agree with Judge Roberts' finding that the *Leon* good faith exception should not apply here. The government does not object to Judge Roberts' finding that no exigent circumstances justified entry into the hotel room, and I do not view this finding as clearly erroneous. Officer safety could not support the warrantless entry into the hotel room. I understand why officers would be concerned about someone in possession of a sawed-off shotgun who, the CI indicated, was also acting crazy on meth. Nevertheless, under the circumstances, neither the officers nor the public were at that time in immediate danger from defendant or his girlfriend, who was also in the room.

Although officers had information to believe that defendant had bladed weapons, and it was conceivable that he had other firearms, there was no evidence that either defendant or his girlfriend was aware of the officers' presence or would pose a danger to them. Officer safety, then, was not an issue unless and until officers created an officer safety issue by making defendant or his girlfriend aware of their presence. Based on the observation of the sawed-off shotgun in the SUV and officers' confirmation of defendant in room 808, officers had probable cause to search the room for defendant and could have obtained a warrant to do so. Given defendant's location in a hotel room on the eighth floor, officers could have easily and safely secured the premises until the warrant

was obtained.  The warrant would then have permitted the officers to enter the room in force to arrest defendant.  Instead, the officers used a ruse to trick defendant into opening the door and then seized him and searched the room.

Nor were there facts to support exigent circumstances to enter the room to prevent the destruction of property.  First, officers had developed the plan to enter the room using the ruse before approaching the room.  All the officers knew when they initiated the ruse to enter room 808 was that defendant may be in possession of methamphetamine, but defendant had no reason to believe officers were investigating him and, thus, officers had no reason to believe that the fear of investigation and discovery would lead defendant to destroy evidence.  Similarly, defendant was not aware of the officers' presence outside room 808 until defendant opened the door.  Again, so long as defendant was unaware of law enforcement officers' presence, the officers had no reason to believe that defendant would destroy evidence.  Second, even after officers knocked on the door of the room, they did not hear movement consistent with an attempt to destroy evidence.

My conclusion is further supported by the lack of full disclosure by the officers in the warrant application on how they gained entry into the hotel room.  The good-faith exception does not apply when the issuing judge is misled by information in the affidavit the affiant knows or should know is false.  *Leon*, 468 U.S. at 923.  Here, although the issuing judge was not misled by information in the affidavit that the affiant knew was false, it is likely that the magistrate judge was misled by an affidavit that the affiant knew was, at least, incomplete.  *See United States v. Moya*, 690 F.3d 944, 948 (8th Cir. 2012) ("In assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit . . .." (quoting *United States v. Grant*, 490 F.3d 627, 632 (8th Cir.2007))).

Here, the officers did not disclose to the state magistrate judge that they used a ruse to gain entry into the hotel room. The affidavits in support of the search warrants state: "[9.] Your affiant and officers from the Waterloo Police Department went to room 808 and Zarate came to the door." (Docs. 55-3, at 6; 55-4, at 4). This implies that the officers simply knocked on the door, announced their presence as law enforcement officers, and defendant voluntarily came to the door. But, that is not what actually happened. There is no evidence in the record, however, to conclude that the officers intentionally excluded that information to mislead the magistrate judge. Rather, it appears that the officers did not recognize that their use of a ruse to gain entry into the hotel room was relevant to the magistrate judge's determination of whether probable cause existed. Thus, although this is not evidence of bad faith by the officers, it detracts from a finding of good faith by the officers. Under these circumstances, I find that the *Leon* good faith exception should not apply to save the evidence obtained in violation of the Fourth Amendment.

Therefore, the government's objection to Judge Roberts' Report and Recommendation is **overruled**.

### C.    *Defendant's Objections*

#### 1.    *Whether the* **Miranda** *Warning Was Sufficient*

Defendant argues that Judge Roberts incorrectly found that the *Miranda* warning given to defendant was adequate.[4] (Doc. 80, at 2-4). Defendant does not contend that

---

[4] Defendant "agrees with [Judge Roberts'] conclusion that [defendant] did not knowingly, intelligently, and voluntarily waive his *Miranda* rights." (Doc. 80, at 2 (citation and internal quotation marks omitted)). Thus, I need not address whether defendant's waiver was, itself, knowing, intelligent, and voluntary. I will note, however, that in objecting to the Report and Recommendation, defendant briefly addresses that he "may have been under the influence of a controlled substance" at the time he was *Mirandized*. (*Id.*, at 3). Although this fact, if true, could impact whether defendant had the capacity to waive his *Miranda* rights, I will not address

the warning Officer Ehlers provided to defendant misstated defendant's constitutional rights, or omitted key words, phrases, or rights. Rather, defendant contends that "[i]t is not reasonable to think a warning given to a person just awoken, tackled, and cuffed on a hotel room hallway at 1 a.m. would apprise that person of the four 'invariable' *Miranda* rights." (*Id.*, at 4 (citing *Florida v. Powell*, 559 U.S. 50, 60 (2010))). In making this argument, defendant analogizes the situation to an officer providing a *Miranda* warning to a person who was asleep; the officer may say all the right words, defendant reasons, but that does not mean the warning is adequate under the circumstances. (*Id.*).

In conducting a de novo review, I find that Judge Roberts correctly concluded that the *Miranda* warning was adequate under the totality of the circumstances. First, there is no evidence that defendant was asleep immediately before officers pulled him out of the room, other than defendant's girlfriend's statements to this effect. Although Judge Roberts spoke of "[a] defendant who is awakened, pulled from his hotel room in the middle of the night, and placed in handcuffs" (Doc. 76, at 28), there is not enough evidence in the record to conclusively determine that defendant had been asleep and, thus, was "awakened."[5]

To the extent Judge Roberts' Report and Recommendation made a factual finding that defendant was awakened by the officers' entry into the room or by a knock on room 808's door, I modify that finding. There is, at most, contradictory evidence as to what defendant was doing in the room before the officers' entry. As noted above, defendant's girlfriend told officers that she and defendant were asleep just before officers entered the room. The record shows, however, that officers spoke to defendant on the phone from

---

that possibility because neither defendant nor the government has raised an objection with respect to whether defendant was under the influence of a controlled substance.

[5] Judge Roberts stated again on page 29 of his Report and Recommendation that defendant was awakened. (Doc. 76, at 29).

the front desk just ten to fifteen minutes before knocking on the door. That defendant was awake such a short time before the officers' entry into room 808 makes it less likely that defendant was asleep when hotel staff knocked on the door and officers subsequently entered the room. Similarly, when officers entered the room, the television was on and the sound on the television was audible on the officers' bodycam recordings. That the television was on and the volume was loud enough to be heard on the recordings makes it less likely that defendant was asleep just prior to the officers' entry into the room.

Also, it appears that defendant was sufficiently cognizant to make a coherent response to Officer Ehlers advising defendant of his rights. Defendant does not object to Judge Roberts' factual findings that Officer Ehlers testified that defendant acknowledged his rights by nodding his head.[6] As Judge Roberts found (Doc. 76, at 29), and as I have found in conducting my own de novo review of the facts, defendant did not immediately answer the officers' questions, but, rather, continued to ask officers why they were there. Defendant was also sufficiently coherent to deny officers consent to search the hotel room. The facts here are simply not analogous to an officer reciting the *Miranda* rights to a sleeping person.

In short, I find that Judge Roberts' conclusion that the *Miranda* warning was adequate was correct, and defendant's objection is **overruled**.

---

[6] I am not troubled by what Judge Roberts perceived to be an inconsistency between Officer Ehlers' report, where Officer Ehlers wrote that defendant "stated he understood" his *Miranda* rights, and Officers Ehlers' testimony that defendant nodded his head in agreement. Whether a person acknowledges understanding verbally or with a gesture, the response constitutes a statement. *See* FED. R. EVID. 801(a) (defining a "statement" as (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion). Similarly, I find that whether Officer Ehlers recited the *Miranda* rights from memory, as he testified, or read the *Miranda* rights as Officer Ehlers indicated in his report, is of no significance and does not, in my mind, cast any doubt about the accuracy of Ehlers' report. Although there can be a difference between reading and reciting, that is not necessarily the case. Merriam-Webster, for example, defines "reciting" as either "to repeat from memory or read aloud . . .." *Reciting*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003).

### 2.    Whether Defendant's Statements at the Police Station Were Fruit of the Poisonous Tree

Defendant argues that Judge Roberts incorrectly found that defendant's statements at the police station, made about one half-hour after defendant's arrest, are admissible. (Doc. 80, at 4-7). Judge Roberts found that defendant's statements at the police station were sufficiently attenuated to purge the taint of the unconstitutional seizure of defendant from the hotel room. (Doc. 76, at 36-41). In reaching this conclusion, Judge Roberts considered (1) whether *Miranda* warnings were given; (2) the temporal proximity between the constitutional violation and the statements; (3) intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. (*Id.*, at 36).

Considering those factors de novo, I, too, find defendant's statements at the police station sufficiently attenuated to be admissible. First, officers did provide defendant a *Miranda* warning at the hotel, which warning I have found was adequate. Second, the temporal proximity between the constitutional violation and the statements was approximately one half-hour. This is not necessarily a long time. But, as Judge Roberts noted, in assessing this factor, courts should "examine the precise conditions" under which the defendant made the statements. (Doc. 76, at 36-37 (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 107 (1980))).[7]

Here, defendant's statements were remote in location from the hotel, defendant was alone in the room at the police station for a while before being questioned, and he was questioned by an officer in a calm manner. Further, a number of defendant's incriminating statements were made after the officer candidly told defendant that some of

---

[7] I agree with defendant that the facts in *Rawlings* were different than the facts here and that the *Rawlings* facts were more favorable to a finding of attenuation than are the facts here. Nevertheless, the Supreme Court did not make the *Rawlings* facts predicates for a finding of attenuation. Rather, the Court instructed lower courts to consider the totality of the circumstances which, necessarily, will be different in every case.

his questions were designed to catch defendant in a lie. Defendant's demeanor and tone during the interview did not portray a person whose will had been overcome. As for intervening circumstances, Judge Roberts pointed out that the questioning took place at a location remote from the location of the constitutional violation, was conducted by an officer uninvolved in that conduct, the questioning officer employed a relaxed and calm tone of interrogation compared to the tone employed at the Casino, and the officer disclosed information to defendant about the case.[8] I also note as an additional intervening circumstance that officers removed defendant's handcuffs at the police station. (Exhibit 10). Finally, I do not find that the officers' purpose, or the flagrancy of their constitutional violation, significantly mitigates the attenuation of the violation. As I noted above, I believe the question of whether the officers had a good faith belief that officer safety justified entry into the room is a close call. Defendant had been in possession of a dangerous sawed-off shotgun, was reportedly acting crazy on meth, and had other bladed weapons. Officers were clearly mistaken in believing that gave them the right to use a ruse to make a warrantless entry into the hotel room, but there is no indication that they did so for the purpose of overcoming defendant's free will to coerce a confession from him.

Thus, although this, too, is a close question, I find that under the totality of the circumstances, defendant's statements at the police station were voluntary and should not be suppressed. Defendant's objection is **overruled**.

---

[8] Although I agree with Judge Roberts that defendant appeared awake and coherent in the interview, I do not consider this an "intervening circumstance." To that extent, I modify Judge Roberts' Report and Recommendation.

### 3. Whether Defendant's Statements at the Police Station Were Made After a Valid *Miranda* Warning

Defendant also argues that because the *Miranda* warning at the hotel was inadequate, defendant's statements at the police station were taken without an adequate *Miranda* warning and must be suppressed. (Doc. 80, at 7-8). Because I have already found the *Miranda* warning was adequate, defendant's objection on this ground is **overruled**.

### 4. Whether the Warrant for Defendant's Urine, When Redacted to Remove Illegally-Seized Evidence, Was Supported by Probable Cause

Defendant objects to Judge Roberts' finding that the warrant for defendant's urine, when excised of unlawfully seized evidence, is still supported by probable cause. (*Id.*, at 8-10). Defendant argues that the facts in the affidavit did not establish probable cause to believe evidence of drug use would be found in defendant's urine.

Judge Roberts concluded that all of the information in paragraphs nine through thirteen, except for the first sentence of paragraph nine, should be redacted from the affidavit as fruit of the poisonous tree. (Doc. 76, at 65-66). Nevertheless, Judge Roberts found that the CI's statement that defendant was in possession of a sawed-off shotgun and methamphetamine was enough to "lead to the logical inference that Defendant could be a drug user in possession of a firearm." (*Id.*, at 67). I respectfully disagree.

*Possession* of a controlled substance does not always imply *use* of a controlled substance. Indeed, it is not uncommon for drug dealers to possess and traffic in controlled substances, yet not use them. Although it is possible that defendant's possession of methamphetamine meant that he could be a user of methamphetamine, it is also possible that defendant possessed methamphetamine with the intent to distribute it, not use it. Indeed, the presence of the firearm would suggest it was more probable that defendant

was a drug dealer because it is clear that "[f]irearms are tools of the drug trade due to the dangers inherent in that line of work." *United States v. Ruiz*, 412 F.3d 871, 881 (8th Cir. 2005) (citations omitted). The affidavit speaks only in terms of a "quantity of methamphetamine," without an indication whether the quantity was a user amount or an amount consistent with further distribution.

Probable cause requires sufficient evidence to establish a probability, not just a possibility. *United States v. Summage*, 481 F.3d 1075, 1078-79 (8th Cir. 2007). Here, evidence that defendant was in possession of a sawed-off shotgun and a quantity of methamphetamine simply established a possibility that he was either a drug user or a drug dealer. That was not enough to establish probable cause.

It is unfortunate that the affiant did not include all he knew in the affidavit in support of the search warrant for defendant's urine. The CI had actually informed the police that defendant was "heavily under the influence of methamphetamine and acting crazy." (Doc. 77, at 7). That information, if it had been in the affidavit, would have been more than sufficient to establish probable cause to believe defendant was an unlawful drug user. For whatever reason, however, the affiant omitted that key information from the affidavit in support of the search warrant for defendant's urine. Without it, and without the information obtained unconstitutionally, all that remains in the affidavit is information that makes it possible, but certainly not probable, that defendant's urine would contain evidence of unlawful drug use.

Thus, I **sustain** defendant's objection in this regard and evidence from defendant's urine is suppressed.

## V.     CONCLUSION

For the reasons set forth above, the government's objections (Doc. 79) are **overruled**, defendant's objections (Doc. 80) are **overruled in part and sustained in part**, the Report and Recommendation (Doc. 76) is **adopted in part and modified in part**, and defendant's motion to suppress (Doc. 47) is **granted in part and denied in part**.  In short, the following evidence is suppressed:

    (1) statements defendant made in the Casino hallway;

    (2) the methamphetamine pipe seized from defendant;

    (3) statements defendant's girlfriend made at the Casino; and

    (4) evidence obtained through execution of the search warrant for defendant's urine.

The Court **denies** defendant's motion to suppress as to all other evidence.

    **IT IS SO ORDERED** this 31st day of July, 2019.


_____
C.J. Williams
United States District Judge
Northern District of Iowa